**SUPERIOR BANK, F.S.B., Plaintiff,**

v.

**TANDEM NATIONAL MORTGAGE, INC., et al., Defendants.**

No. MJG–99–2360.

United States District Court,
D. Maryland.

May 9, 2000.

Order Adhering to Order on Denial of Reconsideration June 27, 2000.

Alison E. Goldenberg, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore, MD, Ava E. Lias Booker, Saul Ewing, LLP, Baltimore, MD, for Superior Bank, FSB.

Robert T. Shaffer, III, Murphy & Shaffer, Baltimore, MD, John Augustine Bourgeois, Kramon & Graham, Baltimore, MD, Kathryn Miller Goldman, Jiranek, Goldman & Minton, PC, Baltimore, MD, James A. Bagley, Law Offices of James A. Bagley, PH, Colorado Springs, CO, for Tandem National Mortgage, Inc.

J. Michael Conroy, Jr., Gaithersburg, MD, for CHS Management and Ross C. Silver.

David D. Hudgins, Hudgins Law Firm, Alexandria, VA, Robert William Carney, Adelphi, MD, for JKV Real Estate Services, John Voyatzis.

Murray A. Zitver, Law Office, Beltsville, MD, Patrick Joseph McAndrew, Law Office, Beltsville, MD, for B&G Financial Services, Inc. and Clint Baldeo.

Robert L. Ferguson, Jr., Michael N. Russo, Jr., Ferguson, Schetelich & Heffernan, PA, Baltimore, MD, for Terrapin Title and Escrow, LLC.

David W. Skeen, Wright, Constable & Skeen, LLP, Baltimore, MD, for Joseph F. Pietropaoli.

Irwin Raphael Kramer, James M. Connolly, Owings Mills, MD, for Lorimar Title Corp.

Timothy G. Casey, Christopher Trikeriotis, Law Office, Baltimore, MD, Keith E. Schwartz, Resnick, Abraham & Schwartzman, LLC, Baltimore, MD, for George W. Johnson and Golden Gate Appraisal Services, Inc.

Mitchel H. Kider, Todd A. Newman, Leah Schmulewitz Getlan, Cynthia Lee Gilman, Weiner, Brodsky, Sidman, Kider, PC, Washington, DC, Joseph F. Yenouskas, Kelley, Drye & Warren, LLP, Washington, DC, for Capital Mortgage Finance Corp. and Accubanc Mortgage Corp.

John A. Garza, James Michael Colliton, Garza, Regan & Associates, PC, Rockville, MD, for Century Title and Escrow Corp.

J. Paul Mullen, Kathleen M. Bustraan, Lord & Whip, PA, Baltimore, MD, Andrew Radding, Andrea Saum Baker, Adelberg, Rudow, Dorf & Hendler, LLC, Baltimore, MD, for Consumers Title Company, Inc.

## MEMORANDUM AND ORDER RE MOTIONS TO DISMISS COMPLAINT AND AMENDED COMPLAINT

GARBIS, District Judge.

The Court has before it a series of motions[1] which seek dismissal of certain counts of Plaintiff's Complaint and the materials submitted by the parties relating thereto.[2] The Court finds a hearing unnecessary to resolve the motions.

## I. BACKGROUND

This case arises out of a series of twenty-three mortgage loan transactions between Plaintiff Superior Bank FSB ("Superior")[3] and Defendant Tandem National Mortgage, Inc. ("Tandem"). Superior is a federal savings bank which is engaged in the business of purchasing mortgage loans on the secondary market. Am. Compl. at ¶ 5. Tandem is engaged in the business of originating, selling and buying mortgage loans. Id. at ¶ 4.

Superior and Tandem entered into a Master Agreement for Purchase and Sale of Mortgage Loans ("Purchase Agreement") on February 11, 1997. Id. at ¶ 37. The Purchase Agreement was renewed on September 15, 1998. Id. Between July 1998 and April 1999, pursuant to the Purchase Agreement, Superior purchased var-

---

1. The motions are: Defendant Lorimar Title Corporation's Motion to Dismiss Counts II through VI [paper # 28], the Motion to Dismiss of Defendant George W. Johnson [paper # 32]; the Motion to Dismiss of Defendant Capital Mortgage Finance Corp. [paper # 46]; the Motion to Dismiss of Defendants JKV Real Estate Services and John K. Voyatzis [paper # 56]; Defendant Tandem National Mortgage, Inc.'s Motion to Dismiss Counts III, IV, V, VI, and VII [paper # 59]; Defendant Lorimar Title Corporation's Motion to Dismiss Counts II Through V of the First Amended Complaint [paper # 62]; the Motion to Dismiss of Defendant Golden Gate Appraisal Services, Inc. [paper # 73]; Defendant Consumers Title Company's Motion to Dismiss Counts II through VI of the First Amended Complaint [paper # 84]; and the Motion for Judgment on the Pleadings of Defendants CHS Management, Inc. and Ross C. Silver [paper # 90].

2. Several Defendants have joined in the motions filed by other Defendants. Defendants Accubanc Mortgage and Century Title joined in the Motion to Dismiss filed by Capital Mortgage Finance Corp.. See Paper # 67; Paper # 82. Defendants CHS Management, Inc. and Ross C. Silver joined in the Motions to Dismiss previously filed by Defendants JKV Real Estate Services, John K. Voyatzis and George W. Johnson. See Paper # 90. Defendants B & G Financial Services and Clint Baldeo joined in the Motion to Dismiss filed by Capital Mortgage Finance Corp. and the Motion for Judgment on the Pleadings filed by Defendant CHS Management, Inc. See Paper # 98. Defendants Terrapin Title, LLC and Joseph H. Pietropaoli joined in the Motions to Dismiss previously filed by Defendants Lorimar Title Corporation, JKV Real Estate Services and John K. Voyatzis, and Consumers Title Company. See Paper # 130.

3. Alliance Funding is a division of Superior that is engaged in the business of purchasing mortgage loans in the secondary market, and the entity that was principally involved in the loan transactions at issue. The Court shall refer to Superior Bank FSB and Alliance Funding collectively as "Superior."

ious mortgage loans originated by Tandem, including the twenty-three loans at issue in the instant case. *Id.* at ¶ 38. Each of the twenty-three loans is secured by residential real property located in Baltimore City, Maryland. *Id.*

Under the Purchase Agreement, each loan transaction was subject to Tandem's fulfillment of various conditions precedent, including a requirement that the representations and warranties made by Tandem in connection with the loan transaction were true and correct and that Tandem was not in default of any obligations it had undertaken in the Purchase Agreement. *Id.* at 39. With respect to each loan transaction, Tandem represented:

- that a written real estate appraisal was made by a disinterested appraiser and in accordance with industry standards;

- that no document prepared by Tandem or to be furnished to Superior contained any untrue statement of material fact or omitted a fact or circumstance necessary to make the statement not misleading;

- that the mortgage loan documents [4] conformed to all applicable laws and were true, valid, genuine, accurate and complete;

- that all legal requirements applicable to the solicitation of the mortgagor and the origination, holding, servicing

and transfer of the mortgage had been complied with by Tandem;

- that there had been no violation of any state law relating to unfair competition in connection with the origination or servicing of the mortgage loan;

- that all parties to the mortgage note and all other documents in the mortgage file were the real parties in interest and had full legal capacity to execute the documents;

- that the mortgage loan was not selected by Tandem for sale to Superior on any basis intended to harm Superior and that all material facts had been disclosed to Superior;

- that the mortgage file contained an appraisal by a disinterested appraiser satisfactory to Superior; and

- that the origination and collection practices used by Tandem with respect to each mortgage were in all respects legal, proper, prudent and customary in the mortgage banking business.

*Id.* at ¶¶ 40A–40I.

Upon breach of any of the representations, warranties or obligations set forth in the Purchase Agreement, Tandem was obligated, upon Superior's request, to repurchase the mortgage loan to which the breach pertained. *Id* at ¶ 41.

Superior claims that Tandem engaged in a scheme [5] with various mortgage brokers,[6] title companies,[7] and appraisers [8] to induce

---

**4.** Including, but not limited to, the mortgage, mortgage note, and any insurance policy.

**5.** In the interest of brevity, the Court will discuss Superior's specific allegations pertaining to a single Defendant only where the parties have raised an issue with respect to the sufficiency of those specific allegations.

**6.** The mortgage brokers involved in this case are: B & G Financial Services, Inc. and its employee Clint Baldeo (collectively "B & G"); Provident Funding Group and its employee

Jock McClees (collectively "Provident"); Universal Lending Group, Inc. ("Universal"); Capital Mortgage Finance Corp. ("Capital"); Home Funding Corporation ("Home Funding") and Accubanc Mortgage Corporation ("Accubanc"). The Court shall refer to the aforementioned mortgage brokers collectively as the "Mortgage Broker Defendants."

**7.** The title companies involved in this case are: JKV Real Estate Services and its employee John K. Voyatzis (collectively "JKV"); Terrapin Title, LLC and its employee Joseph F.

Superior to purchase the twenty-three loans involved in this case at greatly inflated prices. *Id.* at ¶¶ 45–60. In furtherance of the scheme, the Mortgage Broker Defendants allegedly submitted false and inaccurate loan documents that falsely inflated the value of the mortgage property, falsely stated the borrower's income and assets, and/or falsely indicated that the borrowers had made down payments. *Id.* at ¶ 49. In connection with the preparation of the loan documents, the Mortgage Broker Defendants secured the services of the Appraiser Defendants, who prepared appraisals for false and inflated values. *Id.* at ¶¶ 50–51. The Mortgage Broker Defendants also allegedly included in the loan packages terms to make up the difference between the first purchase money deed of trust and the sale price by providing for a large down payment or cash settlement from the borrower. *Id.* at ¶ 54. The Mortgage Broker Defendants included these terms with knowledge that the borrowers could not afford to pay the down payment or cash settlement. *Id.*

The Appraiser Defendants allegedly submitted false and inflated appraisals to the Mortgage Broker Defendants which were, in turn, provided to Tandem and ultimately to Superior. In each transaction, the appraised value was identical to the contract price of the property. *Id.* at ¶ 51. In several of the transactions, the

appraisal failed to reflect that the property had been subject to a "flip." [9] *Id.* In other transactions, the appraisal failed to reflect the true condition of the property. *Id.*

After receiving the loan packages from Tandem, Superior agreed to purchase the mortgage loans in an amount between 60% and 80% of the contract price or appraised value, subject to the condition that the balance be made up by the down payment. *Id.* at ¶ 55. Following this conditional approval, Tandem notified the Mortgage Broker Defendants of loan approval. *Id.* at ¶ 57. The Mortgage Broker Defendants arranged loan closings with the Title Company Defendant with which they were affiliated. *Id.*

Prior to loan closing, the Mortgage Broker Defendants advised the Title Company Defendants of the documents that were needed to settle the loan and the terms that would have to appear on the HUD–1 settlement sheet to make the settlement sheet reflect a *bona fide* transaction. *Id.* at ¶ 58. This was accomplished by listing the inflated appraised value of the property and a false down payment amount on the settlement sheet. *Id.* at ¶¶ 58–59. Contrary to the HUD–1 settlement sheet, the only funds available at settlement were those provided by the lender under the first lien purchase money loan. *Id.* at ¶ 60. The vast majority of the twenty-three loans are in default or have been or are

Pietropaoli (collectively "Terrapin"); Lorimar Title Corp. ("Lorimar"); Century Title and Escrow Corp. ("Century") and Consumers Title Company, Inc. ("Consumers"). The Court shall refer to the aforementioned title companies collectively as the "Title Company Defendants."

8. The appraisers involved in this case are: CHS Management, Inc. and its employee Ross C. Silver (collectively "CHS"); Central Maryland Appraisers, Inc. and its employee JoAnn DiMartino (collectively "CMA"); George W. Johnson ("Johnson"); Erdolph Shiver ("Shiver"); D.P. Appraisal, Inc. ("D.P."); Narade Pramuan ("Pramuan");

Maureen O'Prey ("O'Prey"); Golden Gate Appraisal Services, Inc. ("Golden Gate"); Colonial Appraisers ("Colonial"); Stuart H. Dickman & Associates, Inc. and its employee Stuart Harvey Dickman (collectively "Dickman & Associates"); Value Appraisals ("Value") and William Braunschweiger ("Braunschweiger"). The Court shall refer to the aforementioned appraisers collectively as the "Appraiser Defendants."

9. That is, that the property had been bought and sold immediately prior to the appraisal. *Id.* at ¶ 51.

delinquent. *Id.* at ¶ 47. At least one borrower has filed for bankruptcy. *Id.*

Superior alleges that Tandem breached its obligations under the Purchase Agreement by, *inter alia,* submitting to Superior falsely inflated appraisals on the mortgaged property serving as security for the mortgage loans purchased by Superior, and by failing to confirm the source of down payments made by borrowers where such down payments were excessive in light of the borrower's income and assets. *Id.* at ¶ 43. Superior claims that Tandem is responsible for its own breach, as well as the actions of the Mortgage Broker Defendants, Appraiser Defendants and Title Company Defendants because Tandem retained or appointed those defendants as its agents. *Id.* at ¶ 48. Superior has made a demand upon Tandem to repurchase the twenty-three loans, but Tandem has not done so to date. *Id.* at ¶ 42.

On August 4, 1999, Superior filed the instant lawsuit against Tandem and various mortgage brokers, appraisers and title companies. The Amended Complaint was filed on September 24, 1999, naming additional defendants and bringing the total to thirty-one. The Amended Complaint includes the following claims:

| | |
|---|---|
| COUNT I | Breach of Contract (against Tandem only) |
| COUNT II | Civil Racketeer Influenced and Corrupt Organizations Act |
| COUNT III | Fraud (in connection with appraisals) |
| COUNT IV | Fraud (in connection with down payments) |
| COUNT V | Fraud—Civil Conspiracy |
| COUNT VI | Negligent Misrepresentation (in connection with appraisals) |
| COUNT VII | Negligent Misrepresentation (in connection with down payments) |

10. With respect to Tandem's cross-claims, several Defendants have filed motions to dismiss. The Court will resolve the motions which relate to Tandem's cross-claims by separate Order.

11. Although many of these motions were filed prior to the filing of the Amended Complaint, the Defendants were not required to file new motions to dismiss. *See* 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and procedure: Civil 2d

The Defendants have also filed numerous cross-claims against each other.[10] Numerous Defendants have now filed Motions to Dismiss various counts of the Complaint and/or Amended Complaint.[11]

## II. *LEGAL STANDARD*

The Court must deny a Motion to Dismiss under Rule 12(b)(6)[12] of the Federal Rules of Civil Procedure unless it "appears beyond doubt that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The question is whether in the light most favorable to the Plaintiff, and with every doubt resolved in his behalf, the Complaint states any valid claim for relief." 5A Wright & Miller, Federal Practice and Procedure: Civil 2d, § 1357, at 336. The Court, when deciding a motion to dismiss, must consider well-pled allegations in a complaint as true and must construe those allegations in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). The Court must further disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969).

## III. *DISCUSSION*

Various Defendants have challenged the sufficiency of Plaintiff's claims for Fraud,

§ 1476 (1990) (stating that "[i]f some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.").

12. The legal standard which governs a Motion for Judgment on the Pleadings under Rule 12(c) is substantially the same as the legal standard which governs a Motion to Dismiss under Rule 12(b)(6).

Negligent Misrepresentation and RICO violations. The Court will address each claim in turn.

## B. Tort Claims—Preliminary Issues

### 1. Choice of Law

#### a. Tandem

■ Tandem raises an issue with respect to which state's law governs Superior's tort claims.[13] A federal court exercising diversity or pendent jurisdiction over state law claims must apply the choice of law rules of the forum state, here Maryland. *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 49 n. 11 (4th Cir.1983); *see Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ The contract between Tandem and Superior contains a choice of law provision which states that "[the] Agreement shall be construed in accordance with the laws of the State of New Jersey without regard to internal conflicts of law, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws."[14] Maryland acknowledges that "the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract." *Kronovet v.*

*Lipchin*, 288 Md. 30, 415 A.2d 1096, 1104 (1980).

■ Under Maryland law, the intent of the parties, as evidenced first by the plain language of the contract, governs the issue of whether the choice of law provision applies to contract-related tort claims. *See id.*, 415 A.2d at 1106–07 (considering intent of parties in determining which state's law governed interest and usury issues pertaining to loan transactions). The choice of law provision contained in the Purchase Agreement refers only to the "rights and remedies of the parties hereunder."[15] Based on the plain meaning of these terms, the Court concludes that Tandem and Superior intended for New Jersey law to govern only contract claims, and not tort claims that are merely related to the contract.

■ When a cause of action arises in tort, Maryland's choice of law rules require application of the law of the state where the tortious conduct or injury occurred. In the case at Bar, the tortious conduct is alleged to have occurred in Maryland. Accordingly, the viability Superior's tort claims against Tandem will be resolved according to Maryland law.[16]

#### b. Remaining Defendants

Terrapin[17] raises the choice of law issue in its reply brief, and correctly states that

13. Tandem relies primarily on New Jersey decisions to support its argument that Superior's tort claims fail as a matter of law. Superior argues that Maryland law applies to its tort claims.

14. Tandem Mot. Ex. A., September 15, 1998 Master Agreement for the Purchase and Sale of Mortgage Loans; Tandem Mot. .Ex. B., February 11, 1997 Master Agreement for the Purchase and Sale of Mortgage Loans. The Purchase Agreements are identical, and the Court shall therefore cite to them collectively as "Purchase Agreements." The Court's reference to the Agreements does not require conversion of Tandem's Motion to Dismiss into a Motion for Summary Judgment, because the Agreements are an integral part of Plaintiff's Complaint.

15. Purchase Agreements at ¶ 16(D) (emphasis added).

16. In any event, Tandem effectively acknowledges that the choice of law issue is immaterial, by stating that there is no material difference between the relevant Maryland and New Jersey law.

17. No other Defendant, aside from Tandem, addresses the choice of law issue.

Maryland law applies to Superior's tort claims against all Defendants who were not parties to the Purchase Agreement. *See Barnes Group, Inc. v. C & C Products, Inc.,* 716 F.2d 1023, 1032 n. 25 (4th Cir. 1983) (stating that a "contractual choice-of-law provision, of course, can have no bearing on the law controlling a tort action brought•against a third person not a party to the contract."). Accordingly, the viability of Superior's tort claims against the Mortgage Broker Defendants, the Appraiser Defendants and the Title Company Defendants will be resolved according to Maryland law.

### 2. *The Economic Loss Rule*

■ Tandem [18] argues that Superior's state law tort claims for fraud (Counts III and IV) and negligent misrepresentation (Counts VI and VII) are barred by the economic loss rule. Plaintiff points to Maryland cases allowing contract and tort actions to be brought in the same case in support of its argument that its tort actions should survive Tandem's Motion. *See, e.g. Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982); *Aeropesca Ltd. v. Butler Aviation Int'l, Inc.,* 44 Md.App. 610, 411 A.2d 1055 (Spec.App.1980).

■ In general, when a "controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between businessmen, it is plainly contract law which should provide the rules and principles by which the case is to be governed." *Flow Industries, Inc., v. Fields Construction Co.,* 683 F.Supp. 527, 530 (D.Md.1988); *see Martin Marietta Corp. v. International Telecommunications Satellite Organization,* 991 F.2d 94 (4th Cir. 1993) (*citing* 763 F.Supp. 1327 (D.Md. 1991)).

The Purchase Agreement imposed numerous duties on Tandem, including, as Superior points out, an express duty to warrant that the representations were "true and correct" and that all information contained in the loan files was "complete, accurate, and correct." [19] The Purchase Agreement also contains the following provision regarding remedies:

> All remedies and rights in favor of [Superior] as against [Tandem] provided in this Agreement are cumulative and are in addition to and not in limitation of all other rights and remedies which [Superior] may at any time have in law or at equity against [Tandem] for or on account of any breach or violation by [Tandem] of the terms, provisions, agreements, covenants, representations, warranties and undertakings of [Tandem] made or provided for in this agreement.[20]

---

**18.** The Court acknowledges that Capital (joined by Accubanc, B & G, and Century) and Terrapin have made arguments with respect to the "economic loss rule" as well. For purposes of analysis, a distinction must be drawn between those Defendants with which Superior had contractual privity, and those Defendants with which Superior did not. *Flow Industries, Inc. v. Fields Construction Co.,* 683 F.Supp. 527, 529 (D.Md.1988).

The arguments of Capital and Terrapin are focused on the issue of whether Superior can establish that they had a duty to Superior, which is required to prove the negligent misrepresentation claims. Because this duty is itself an element of the negligent misrepresentation claim, and because the majority of the other Defendants who have raised this issue have discussed the duty requirement in their discussions of the negligent misrepresentation counts, the Court will address the arguments of Capital and Terrapin regarding the economic loss rule fully in section III.E.1.

**19.** Purchase Agreements at ¶¶ 3(b)(i), (4)(b)(i)-(ii), 4(b)(xxxv).

**20.** Purchase Agreements at ¶ 14(I); *see id.* at ¶ 12 ("The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.")

■ The allegations contained under the headings of fraud and negligent misrepresentation repeat, nearly word for word, the allegations contained under the breach of contract claim. Tandem relies heavily on this parallelism in arguing that the contract provides Superior's exclusive remedy, an argument that would have great weight in a typical case. This case presents a somewhat unique situation,[21] however, due to the contractual provision stating that the rights created by the Purchase Agreements are *cumulative*. As a result, there is, at a minimum, an ambiguity as to whether the parties intended to define the full scope of their duties in the Purchase Agreements.[22] Accordingly, Tandem is not entitled to dismissal of Superior's tort claims based on the economic loss rule.

### 3. *Appraisals as Mere Statements of Opinion*

■ Several Defendants[23] argue that Superior's state law tort claims for fraud and negligent misrepresentation based on allegedly inflated appraisals (Counts III and VI) fail to state a claim because appraisals, as mere statements of opinion, are not actionable as a matter of law. CHS also argues that Superior could not have reasonably relied on the appraisals. Superior contends that appraisals are more than mere statements of opinion, but rather professional evaluations of value, and that its reliance was reasonable.

■ On a general level, Capital and CHS correctly maintain that in Maryland, "representations as to the quality or condition of property are not actionable where they are mere expressions of opinion." *Fowler v. Benton*, 229 Md. 571, 185 A.2d 344, 349 (1962); *see Appel v. Hupfield*, 198 Md. 374, 84 A.2d 94 (1951); *Johnson v. Maryland Trust Co.*, 176 Md. 557, 6 A.2d 383 (1939). Maryland does acknowledge, however, that "representations as to quality and condition may constitute fraud where they are asserted as statements of fact." *Fowler*, 185 A.2d at 349. Moreover, the essence of the transactions at

---

21. In that none of the contracts involved in all of the cases cited by counsel, and discovered by the Court, involved the imposition of a duty regarding the making of representations, or a provision stating that the remedies supplied by the contract were cumulative. *Compare Martin Marietta*, 991 F.2d at 96; *Flow Indus.*, 683 F.Supp. at 531–32.

Tandem argues that these distinctions are irrelevant. However, in the instant context of a motion to dismiss, and drawing all inferences in favor of Superior, the Court cannot say that Plaintiff could prove "no set of facts" which would entitle it to relief.

22. In addition, Tandem acknowledges that the economic loss rule does not apply to bar fraudulent inducement claims. *See Martin Marietta*, 991 F.2d at 98–99. In the context of Superior's claim against it, Tandem attempts to argue that the allegations in this case could not support a claim for fraudulent inducement, and that Superior has failed to draw a "critical distinction."

It appears, however, that Tandem is trying to have its cake and eat it too. Tandem has filed cross-claims for fraud against all of the Defendants, conditionally adopting Superior's fraud allegations and adding no new facts of its own. As discussed in the Court's Memorandum and Order Re Motions to Dismiss Tandem's Cross–Claims, Capital makes the same arguments in support of dismissal of the cross-claim which Tandem made with respect to the economic loss rule in the context of Superior's claim against Tandem. In opposition, Tandem argues that the Broker Agreements between itself and Capital were "agreements to contract," and that Tandem's fraud claim, which is identical to Superior's fraud claim, could be characterized as fraud in the inducement. Tandem has failed, however, to explain why its agreement with Superior could not be similarly characterized as an "agreement to contract."

23. Capital (joined by Accubanc, B & G and Century) and CHS have advanced this argument.

issue are those in which an honest appraisal, a best professional estimate of value, would be provided and not, as alleged, a fraudulent or negligent statement.

Superior has pointed to several decisions which suggest circumstances under which an appraisal may be actionable. Although these decisions do not apply Maryland law, the Court finds them persuasive.[24] In *Costa v. Neimon*, 123 Wis.2d 410, 366 N.W.2d 896 (App.1985), for example, purchasers of real property sued the lender's real estate appraiser for negligent misrepresentation as to the fair market value of the property, and a jury found for the plaintiffs. *Id.* The jury had heard testimony regarding the items that are considered in making an appraisal, including square footage, improvements, etc. *Id.* at 416, 366 N.W.2d 896. The Wisconsin Court of Appeals found that the jury could reasonably have concluded that the appraisal was a statement of opinion which carried an implied assertion that facts existed to support his opinion, and thus that there had been an actionable misrepresentation of fact.[25] *Id.*

In *Larsen v. United Federal Savings and Loan Ass'n of Des Moines*, 300 N.W.2d 281 (Iowa 1981), a negligence action, the appraiser admitted that he would sometimes "hurry through an appraisal" and was told to "be more careful." *Id.* at 284. Further, there were indications of serious defects in the property which a jury could have concluded a competent appraiser would have noticed. *Id.* at 288.[26]

Superior alleges that each of the appraisals involved in the case at Bar contained falsely inflated prices and that it reasonably relied on the appraisals.[27] It may very well be that, at a later stage of the case, Superior will be unable to prove that the appraisals constitute false representations of fact as opposed to mere opinions and/or that its reliance was reasonable. For purposes of the instant motion, however, the Court must accept all well pleaded allegations as true. Applying that standard, the Court cannot conclude beyond doubt that Superior can prove no set of facts which would entitle it to relief based on the allegedly false appraisals.

### 4. *Successor Liability*

█ Golden Gate has moved to dismiss because it was not incorporated until after the actions alleged by Superior took place. Superior alleges that Johnson, as Golden Gate's employee, conducted appraisals of three properties. Am. Compl. at ¶¶ 108–

---

**24.** It does not appear that there are any reported Maryland decisions dealing with the precise issue at hand.

**25.** The Wisconsin Court of Appeals further held that expert testimony that the property was worth roughly $8,500 less than the appraised value was sufficient to support the jury's conclusion that the appraisal constituted a false statement. *Id.* at 416–17, 366 N.W.2d 896.

**26.** *See also First Federal Savings and Loan Ass'n of Rochester v. Charter Appraisal Co., Inc.*, 247 Conn. 597, 724 A.2d 497 (1999) (approving award of tort damages based on a negligent appraisal); *James v. Nationsbank Trust Co. Nat'l Assoc.*, 639 So.2d 1031, 1034

(Fla.Ct.App.1994) (stating that "[a]n appraisal, while opinion, may support a claim of fraud where the appraisal is an expression of a false opinion."). *Compare McCollum v. P/S Investments Ltd.*, 764 S.W.2d 252, 254–55 (Tex.App.1988) (granting summary judgment to defendant appraiser because plaintiff real estate broker failed to establish a genuine issue of fact with respect to whether the appraiser had knowledge superior to that of the real estate broker, and record reflected that the plaintiff suffered from "studied ignorance").

**27.** The Court notes that Superior also alleges that numerous appraisals failed to reflect that the property was the subject of a "flip," an apparently significant fact.

112; *id.* at ¶¶ 123–24. Golden Gate, however, was not incorporated until August 20, 1999, after the filing of this lawsuit. Accordingly, Golden Gate had no corporate existence when the allegedly tortious actions were committed. It would appear that the only way that Golden Gate could be held liable for Johnson's actions which occurred prior to the incorporation is on a theory of successor liability.

Under Maryland law, the general rule regarding successor liability is one of non-liability, subject to four exceptions. The Maryland Court of Appeals has stated that:

> "a corporation which acquires all or part of the assets of another corporation does not acquire the liabilities and debts of the predecessor unless: (1) there is an express or implied agreement to assume the liabilities; (2) the transaction amounts to a consolidation or merger; (3) the successor entity is a mere continuation or reincarnation of the predecessor entity; or (4) the transaction was fraudulent, not made in good faith, or made without sufficient consideration."

*Nissen Corp. v. Miller,* 323 Md. 613, 594 A.2d 564, 565–66 (1991) (citations omitted). The Court concludes that dismissal of its claims against Golden Gate at the current stage of this litigation would be premature, because one or more of the exceptions to the general rule might apply.

In particular, Superior argues that Golden Gate could be considered a "mere continuation" of the business previously operated by Johnson, or alternatively, that Golden Gate might have been incorporated for the purpose of shielding Johnson's assets from tort claims. Superior will be allotted time to conduct expedited discovery relating to the possible successor liability of Golden Gate for Johnson's actions.

Golden Gate will then have the opportunity to move for summary judgment, also on an expedited basis, on the successor liability issue.

### C. *Fraud*

In Count III, Superior alleges that the Defendants committed fraud in connection with the appraisals of twenty-one properties that secured mortgages which were the subject of its purchases from Tandem. Am. Compl. ¶¶ 150–53. In Count IV, Superior alleges that the Defendants committed fraud, with respect to each of the twenty-three loans that are the subject of this lawsuit, in connection with the down payments listed on the HUD–1 settlement sheets and the income and assets listed on the borrowers' loan applications. *Id.* at ¶¶ 155–57. Various Defendants argue that Superior has failed to plead fraud with particularity. Other Defendants argue that certain counts should be dismissed against them because Superior has failed to allege that they were involved in the allegedly false representations.

#### 1. *Failure to Plead with Particularity*

 Capital, JKV, CHS, Lorimar and Consumers[28] argue that Superior has failed to satisfy the requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "[i]n all averments of fraud[,] the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). The word "circumstances" is interpreted to include the "time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby." *Windsor Assocs. v. Greenfeld,* 564 F.Supp. 273, 280

---

**28.** In addition, Accubanc, B & G, Century, and Terrapin have adopted the motions of some of the Defendants who have advanced this argument.

(D.Md.1983). Rule 9(b) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which demands only "a short and plain statement of the claim," and with the Federal Rules' policy in favor of flexibility and simplicity in pleading. *See All Risks, Ltd. v. The Equitable Life Assurance Soc'y,* 931 F.Supp. 409, 418 (D.Md. 1996); *PPM Am., Inc. v. Marriott Corp.,* 820 F.Supp. 970, 973 (D.Md.1993). The central question which arises when a complaint is attacked under 9(b) "is how much detail is necessary to give adequate notice to the opposing party in order to enable that party to prepare adverse pleadings." *PPM,* 820 F.Supp. at 973.

The Fraud Counts incorporate by reference all preceding paragraphs of the Amended Complaint. Accordingly, an examination of the entire Amended Complaint is necessary. The Court concludes that although Superior's pleading is far from artful, a full reading of the allegations contained in the Amended Complaint provides sufficient detail to enable the Defendants to respond to Superior's allegations.[29]

With respect to each Defendant, the Amended Complaint includes a description of the general items (i.e., preparation of appraisals, preparation of documents, collection of payments) which Superior alleges that each particular Defendant was responsible for.[30] In addition, the Amended Complaint alleges that the representations made in connection with these activities were communicated to Superior.[31] These descriptions provide a background understanding of Superior's fraud allegations against the various Defendants, which are fleshed out in more detail in later portions of the Amended Complaint. The Court will specifically discuss the sufficiency of the allegations with respect to the Mortgage Broker Defendants, the Title Company Defendants, and the Appraiser Defendants below.

### a. *Mortgage Broker Defendants*

With respect to the Mortgage Broker Defendants in particular, Superior first alleges, in general terms, that they

---

**29.** The Court has undertaken the somewhat painful task of sorting out which allegations pertain to which particular Defendants, leading to the conclusion that the Fraud Claims have been pleaded with sufficient particularity. The Defendants themselves could certainly have saved themselves, and the Court, a considerable amount of time and effort had they read Superior's Complaint (or Amended Complaint) in its entirety.

**30.** Superior alleges that the Mortgage Broker Defendants "acted as mortgage broker[s] and mortgage banker[s]." Am. Compl. at ¶¶ 6–7(B & G); *id.* at ¶ 21 (Capital); *id* at ¶ 29 (Accubanc). Superior alleges that the Title Company Defendants were "responsible for the preparation of the documents of conveyance, including deeds, leasehold assignments and deeds of trust; conducted settlements of the sale and financing transactions; collected payments from the buyers and sellers; and disbursed purchase money, including down payments, and loan proceeds" and that their

employees "participated in the preparation of ... settlement documents, conducted settlements, and acted as a disbursement agent." *Id.* at ¶¶ 8–9(JKV); *id.* at ¶¶ 14–15 (Terrapin); ¶ 18 (Lorimar); ¶ 23 (Century); ¶ 25 (Consumers). Superior alleges that the appraisers "prepared appraisals." *Id.* at ¶¶ 10–11(CHS).

**31.** To the extent that any of the Defendants argue that Superior's fraud claim fails because there is no allegation that the communication was made directly to Superior, that argument has no merit. In *Sempione v. Provident Bank of Maryland,* 75 F.3d 951 (4th Cir.1996), the Fourth Circuit stated that, in the context of a fraud claim, the Maryland courts would not require that the allegedly false representation be made directly to the plaintiff. *Id.* at 962–63 (*citing L & P Converters, Inc. v. Alling & Cory Co.,* 100 Md.App. 563, 642 A.2d 264, 268–69 (Spec.App.1994) and *quoting* Restatement (Second) of Torts § § 532–33 (1977)).

- submitted "false and inaccurate loan documents that falsely inflated the value of the mortgage property, that falsely stated the borrower's income and assets, and/or that falsely indicated that the borrowers had made the down payments reflected in the HUD–1 settlement sheets;" and

- "includ[ed] in the loan packages false terms to make up the difference between the first purchase money deed of trust and the sale price by including terms for a large down payment, which they knew would not be made, or cash at settlement from the borrower, which they knew was unavailable."

Am. Compl. at ¶¶ 49, 54. Standing on their own, these allegations would not appear to meet Rule 9(b)'s requirements.

The Amended Complaint, however, contains a separate section pertaining to each Mortgage Broker. Am. Compl. at ¶¶ 61–87(B & G); *id.* at ¶¶ 88–98 (Capital); *id.* at ¶¶ 125–133 (Accubanc). Within each section, the Amended Complaint lists the particular borrowers and particular loans which Superior alleges each Mortgage Broker was involved in, and the dates on which each loan was made. *Id.* at ¶¶ 65–87 (B & G involved in Calamita, Pinkett, Mavris, Vogtman and Hines transactions); *id.* at ¶¶ 92–98 (Capital involved in Cobb transactions); *id.* at ¶¶ 129–33 (Accubanc involved in Brown loans). Furthermore, as will be discussed in more detail below, the Amended Complaint alleges, with respect to each particular loan transaction, the precise false statements that were contained in the loan documents that, according to Paragraph 49, the Mortgage Broker Defendants submitted to Tandem for eventual transmittal to Superior. Following a full analysis of the Amended Complaint, the Court concludes that Superior has made more than conclusory allegations of fraud with respect to the Mortgage Broker

Defendants, including B & G, Capital and Accubanc.

b. *Title Company Defendants*

With respect to the Title Company Defendants, Superior alleges generally that:

- They were "advised by the mortgage brokers of the documents needed to settle the loan and the terms that would have to appear on the HUD–1 settlement sheet, to make the settlement sheet appear as if a *bona fide* transaction was conducted based on the inflated appraised value of the properties, including, upon information and belief, a false down payment amount;" and

- Their closing agents "prepar[ed] and submitt[ed] HUD–1 settlement statements that in many instances reflected down payments made by borrowers when, in fact, such down payments were not made."

- "Contrary to the settlement sheet prepared for each loan, the only funds actually available at settlement were those provided by the lender under the first lien purchase money loan."

*Id.* at ¶¶ 58–60. Superior alleges that it purchased the subject loans (at least in part) in reliance upon the borrower's ability to make the required down payment. *E.g., id.* at ¶¶ 66, 78, 93, 106, 109, 123.

With respect to JKV in particular, Superior alleges that JKV acted as the Title Company on the Calamita, Pinkett, Vogtman, and Hines loans. *Id.* at ¶¶ 65, 72, 84, and 86. JKV allegedly performed the following acts:

- Prepared HUD–1 settlement statements signed by the borrowers on the date of closing indicating down payments on multiple pieces of property typically purchased on the same day, and in total amounts in excess of the

liquid assets identified on the borrowers' loan applications;

- Prepared settlements indicating seller concessions or contributions toward closing ranging from $2000 to $3000 per mortgaged property;
- Included in the loan files "estimated" or stricken through settlement statements in addition to the "final" settlement statement, indicating a lower down payment from the borrower, a second mortgage to be taken by the seller and credits from the seller toward the purchase price; and
- Failed to include in the loan file certified checks from the borrowers confirming their payment of the down payment.

*Id.* at ¶ 64.

In connection with the three Calamita loans in particular, Superior alleges that JKV prepared an extra settlement statement "which provided for lower down payments, seller second mortgages and seller contributions toward the contract price." *Id.* at ¶ 65. These concessions were not included in the final settlement statement signed by Calamita, and the final settlement was not faxed by JKV until weeks after the settlement. *Id.*

In connection with the two Pinkett loans, Superior alleges that JKV prepared settlement statements which provided for down payments in excess of $27,500, notwithstanding a monthly salary of $6,500 and unverified bank account balances of $20,578, and purported seller contributions toward the contract price of over $3000. *Id.* at ¶ 72.

In connection with the Vogtman loan, Superior alleges that JKV prepared a set-

tlement statement which indicated a down payment of $23,087, notwithstanding a monthly salary of $1437 and bank account balances of $4101. *Id.* at ¶ 84.

In connection with the Hines loan, Superior alleges that JKV prepared a settlement statement which indicated that Hines made a down payment of $15,421.84, notwithstanding a monthly salary of $1721.21 and bank account balances of $4160, when in fact Hines made no such payment. *Id.* at ¶ 86.

With respect to Terrapin in particular, Superior alleges that Terrapin acted as the Title Company on the Mavris, Jones, and Purnell loans. *Id.* at ¶¶ 77, 103, 117.

In connection with the three Mavris loans, Superior makes the same general allegations that it did against JKV. *Id.* at ¶ 64. Superior further alleges that Terrapin prepared settlement statements indicating down payments of over $40,000, notwithstanding a stated yearly salary of $42,000 and unverified bank account balances of $10,455. *Id.* at ¶ 77.

In connection with the two Jones loans, Superior alleges generally that Terrapin

> prepared HUD–1 settlement statements signed by the borrower on the date of closing indicating down payments on multiple pieces of property being purchased by borrower on the same day or within days of the other two settlements, and in total amounts in excess of the liquid assets identified on the borrower's loan application, when in fact no such payments were made.

*Id.* at ¶ 102. More specifically, Superior claims that the settlement statements indicated that Jones made total down payments of over $13,800,[32] when in fact no

---

32. The settlement statements indicated this down payment amount, notwithstanding the fact that one loan application listed a monthly salary of $5267 and other monthly income of

$400, and the other listed a monthly salary of $5174 and other monthly income of $200, plus bank account balances of $6600. Am. Compl. at ¶ 103.

such down payments were made. *Id.* at ¶ 103.

In connection with the three Purnell loans, Superior alleges generally that Terrapin "prepared HUD–1 settlement statements signed by the borrower indicating down payments on multiple pieces of property being purchased by borrower[s] on the same day in excess of the liquid assets identified on the borrower's loan applications." *Id.* at ¶ 116. In particular, Terrapin allegedly prepared settlement statements indicating total down payments of over $32,400 [33] on the same day which were not made. *Id.* at ¶ 117.

Superior alleges that Century acted as the Title Company on the three Cobb loans. *Id.* at ¶ 92. Superior alleges that Century

> prepared HUD–1 settlement statements signed by the borrower on the date of closing indicating down payments on multiple pieces of property being purchased by the borrower on the same day or within days of the other two settlements, and in total amounts in excess of the liquid assets identified on the borrower's loan applications, when in fact no such down payments were made.

*Id.* at ¶ 91. In particular, Century prepared a settlement statement requiring down payments of over $44,000, notwithstanding a monthly salary of $2500, no bank accounts, and other income of about $1000. *Id.* at ¶ 92. These down payments were not made. *Id.*

Superior alleges that Lorimar acted as the Title Company on the King and Brown loans. *Id.* at ¶¶ 108, 129. In general, Superior claims that Lorimar

prepared HUD–1 settlement statements signed by the borrower on the date of closing indicating down payments on multiple pieces of property being purchased by borrower[s] on the same day or within days of the other … settlements, and in total amounts in excess of the liquid assets identified on the borrower's loan applications, when in fact no such payments were made.

*Id.* at ¶ 102. With respect to the two King loans, Superior claims that Lorimar prepared settlement statements indicating that King made total down payments of over $17,486 on the same day, notwithstanding a monthly salary of $2583, other monthly income of $684, and inconsistencies as to bank account balances. [34] *Id.* at ¶ 108. No such payments were made. *Id.*

Superior alleges that Consumers acted as the Title Company on the Ekanem loan. *Id.* at ¶ 123. Superior claims that Consumers prepared a settlement statement which indicated a down payment of $16,454.36, notwithstanding a monthly salary of $3935 and no listed bank account balances. *Id.*

In view of the above allegations, the Court concludes that Superior has sufficiently alleged the circumstances surrounding its fraud claims against the Title Company Defendants, including JKV, Terrapin, Lorimar, Century and Consumers.

#### c. *Appraiser Defendants*

With respect to the Appraiser Defendants, Superior alleges generally that

- Each one prepared appraisals of the property at issue for false and extremely inflated values;

---

**33.** The settlement statements indicated this amount, notwithstanding the fact that one loan application listed a monthly salary of $2182 and the other two a monthly salary of $5069.

**34.** One loan application indicated a balance of $12,750 and the other a balance of $6500. Am. Compl. at ¶ 108.

- In every single case the appraised value was identical to the contract price of the property;
- In other instances, the appraisal failed to reflect that the subject [property] was the subject of a "flip" in that the property had been bought and sold just prior to the appraisal; and
- there were other instances in which the condition of the property (i.e., boarded up) was not reflected in the appraisal.

*Id.* at ¶ 51.

With respect to CHS in particular, the Amended Complaint alleges its involvement in the Calamita and Pinkett loans. *Id.* at ¶¶ 66–71; *id.* at ¶¶ 73–76. Superior alleges that CHS

knew that the appraisal was to be used in connection with a mortgage transaction, prepared and submitted an appraisal report stating a falsely inflated value substantially in excess of the fair market value of the property, and prepared an appraisal indicating an appraised value identical to the contract price for the property.

*Id.* at ¶ 63. With respect to each of the three loans made to Calamita, and each of the two loans made to Pinkett, Superior alleges the date of the loan and the amount of the appraisal. *Id.* at ¶¶ 66, 68, 70, 73, 75. Superior claims that it purchased each loan (at least in part) in reliance upon the appraisal. *Id.* at ¶¶ 66, 68, 70, 73, 75. The Amended Complaint further alleges that Superior later had a second appraisal performed, revealing that the initial appraisal conducted by CHS (and/or Silver) was inflated. *Id.* at ¶¶ 67, 69, 71, 74, 76. Moreover, in Count III, the Complaint again discusses each of the Calamita and Pinkett loans, and alleges the false misrepresentation specifically. *Id.* at ¶¶ 151A–E. An analysis of the Amended Complaint leads the Court to conclude that Superior has adequately alleged its fraud claim against CHS.

In sum, the Court concludes that Superior has pleaded its fraud claims with enough specificity to survive the challenges advanced by the various Motions to Dismiss. Accordingly, the Court will not dismiss the fraud claims on the basis of a failure to plead fraud with particularity as required by Rule 9(b).

### 2. *Inapplicability of Count IV to Certain Defendants*

Johnson (joined by CHS) argues that Count IV fails to state a claim against the Appraiser Defendants because it alleges only that the lender, mortgage brokers, and title companies misrepresented down payments and borrowers' assets. Count IV incorporates by reference the allegations contained in Paragraphs 1–153, and alleges that:

- The Defendants falsely and fraudulently and with intent to defraud Superior represented to Superior that each borrower made the down payments set forth in the HUD–1 settlement statements and had the income and assets set forth in their loan applications;
- Superior relied upon the representations set forth in the settlement statements submitted by Defendants and was thereby induced to purchase the mortgage loans from Tandem;
- As a result, Superior paid an amount to purchase the mortgage loans generally in excess of 100% of the fair market value of the property, and now many of the loans are delinquent or in default.

*Id.* at ¶¶ 155–57.

The Amended Complaint contains no allegations that Johnson or CHS, or any of the Appraiser Defendants for that matter, were involved in any of the allegedly false

statements regarding borrowers' down payments, income or assets.[35] Moreover, the Court notes that Count IV demands judgment against only "Tandem, the mortgage broker, and the title company/closing agent Defendants." *Id.* Accordingly, the Court concludes that, to the extent that Superior intended to include them in Count IV, Count IV fails to state a claim for fraud against any of the Appraiser Defendants.

### D. Conspiracy

■ In Count V, Superior attempts to state a claim for conspiracy under Maryland law. Under Maryland law, a civil conspiracy is "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Green v. Washington Suburban Sanitary Comm'n,* 259 Md. 206, 269 A.2d 815, 824 (1970); *Robb v. Wancowicz,* 119 Md.App. 531, 705 A.2d 125, 132 (Spec.App.1998).

■ Civil conspiracy is not "a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the Plaintiff." *Alexan-*

der & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.,* 336 Md. 635, 645 n. 8, 650 A.2d 260 (1994). Accordingly, the Court will dismiss Count V; however, the Court is not foreclosing Plaintiff from seeking to hold Defendants liable for the actions of others on a conspiracy theory.[36] The Court simply holds that there is no separate free standing tort of conspiracy.

### E. Negligent Misrepresentation

■ In Count VI, Superior alleges that Tandem, the Appraiser Defendants and the Mortgage Broker Defendants committed negligent misrepresentation in connection with the appraisals of twenty-one properties that secured mortgages which were the subject of its purchases from Tandem. Am. Compl. ¶¶ 161–67. In Count VII, Superior alleges that Tandem, the Mortgage Broker Defendants and the Title Company Defendants committed negligent misrepresentation, with respect to each of the twenty-three loans that are the subject of this lawsuit, in connection with the down payments listed on the HUD–1 settlement sheets and the income and assets listed on the borrowers' loan applications. *Id.* at ¶¶ 168–74.

■ In Maryland, in order to state a claim of negligent misrepresentation, a plaintiff must allege that:

---

**35.** Superior failed to respond to this argument in its Consolidated Opposition. Further, the Court notes that when Superior amended its complaint, it cured this type of problem with respect to the negligent misrepresentation counts, but did not do so with respect to its fraud claim.

**36.** In light of this conclusion, the Court need not address the argument advanced by JKV, (joined by CHS and Terrapin), CHS (joined by B & G), Lorimar (joined by Terrapin) and Consumers (joined by Terrapin) that Superior has failed to allege a civil conspiracy with particularity. Furthermore, the Court notes that the argument advanced by Lorimar and

Consumers (both joined by Terrapin) that the Title Companies cannot be held liable because they entered any "conspiracy" after the consummation of the sale of the mortgage loans to Superior would not provide a basis for dismissal. Both parties rely on *Yousef v. Trustbank Savings, F.S.B.,* 81 Md.App. 527, 568 A.2d 1134 (Spec.App.1990). In *Yousef,* it was not alleged that the Defendant was involved in any conspiracy until after the allegedly fraudulent sale was consummated; here, by contrast, Superior alleges that the Mortgage Broker Defendants made specific misrepresentations prior to the sale of mortgages to Superior.

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Gross v. Sussex*, 332 Md. 247, 630 A.2d 1156, 1162 (1993). Several Defendants argue that Superior cannot establish the existence of a duty of care, or that Superior has inadequately alleged the damages element of the tort. Other Defendants argue that certain counts should be dismissed against them because Superior has failed to allege that they were involved in the allegedly false representations.

### 1. *Duty of Care*

■ Several Defendants[37] argue that Superior cannot, as a matter of law, establish the necessary duty to succeed on its negligent misrepresentation claim. In the context of negligent misrepresentation, the Maryland Courts hold that where the failure to exercise due care creates a risk of economic loss only, "an intimate nexus between the parties [i]s a condition to the imposition of tort liability." *Weisman v. Connors*, 312 Md. 428, 540 A.2d 783, 791 (1988) (*quoting Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986)). Such an intimate nexus requires "contractual privity or its equivalent." *Id.*

Superior does not contend that it had a contractual relationship with any Defendant aside from Tandem. As to the Mortgage Broker Defendants, the Title Company Defendants, and the Appraiser Defendants, the question, therefore, becomes whether Superior can allege an intimate nexus. As this Court has stated, "an 'intimate nexus' cannot exist unless a defendant is aware of a specific party or class of parties which intend to rely upon he defendant's statement." *Tischler v. Baltimore Bancorp*, 801 F.Supp. 1493, 1504 (D.Md.1992) (*quoting Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1062 (S.D.N.Y.1989)). This requirement addresses the concern, often echoed by the Maryland Court of Appeals, that liability not be extended to unknown or unforeseen third parties.

In support of its negligent misrepresentation claims, Superior alleges that "the Defendants knew or should have known that the 23 mortgage loans at issue in this case could have been sold and/or assigned on the secondary market to a subsequent purchaser such as Superior." Pl. Opp. at 24–25; *see* Am. Compl. at ¶¶ 10, 11, 19, 45–60, 63, 89, 101, 164, 171–72. Although the Mortgage Broker Defendants, Title Company Defendants and Appraiser Defendants are not alleged to have communicated directly with Superior, Superior alleges that they knew that the information that they were providing about a particular mortgage could be used in connection with a sale of the loan to a buyer on the secondary market. In the dismissal context, necessarily drawing all inferences in favor of Superior, the Court concludes that Superior has sufficiently pleaded the duty ele-

---

**37.** Capital (joined by Accubanc, B & G and Century), Johnson (joined by CHS), JKV (joined by CHS and Terrapin), CHS (joined by B & G), Lorimar (joined by Terrapin) and Terrapin advance this argument.

ment of its negligent misrepresentation claim.[38]

### 2. *Allegation of Damages*

Several Defendants [39] argue that Superior's allegation of damages is insufficient, as it does not allege *how* it suffered any damages in reliance on those Defendants' actions. *See* Am. Compl. at ¶ 174. No case law has been cited for the proposition that the failure to allege exactly how damages were suffered is grounds for dismissing an otherwise adequately pleaded claim. Moreover, each count of the Amended Complaint incorporates by reference all preceding paragraphs. Numerous times in the preceding paragraphs Superior alleges that the damages were suffered because it was induced to purchase loans in excess of 100% of their fair market value. Superior may very well be unable to prove that it suffered damages proximately caused by these Defendants' misrepresentations. Nonetheless, reading Superior's allegations in the light most favorable to the Plaintiff, the Court concludes that the damages element of the negligent misrepresentation claim has been pleaded adequately.

### 3. *Inapplicability of Counts VI and VII to Certain Defendants*

Lorimar and Consumers (both joined by Terrapin) argue that Count VI fails to state a claim against the Title Company Defendants.[40] Count VI alleges conduct on the part of Tandem, the Appraiser Defendants, and the Mortgage Broker Defendants. Count VI therefore does not even purport to state a claim against the Title Company Defendants.[41]

Johnson (joined by CHS) similarly argues that Count VII fails to state a claim against the Appraiser Defendants. Count VII alleges conduct on the part of Tandem, the Mortgage Broker Defendants and the Title Company Defendants. Count VII therefore does not even purport to state a claim against the Appraiser Defendants.

### F. *RICO Claims*

The Racketeer Influenced and Corrupt

---

**38.** *See Village of Cross Keys, Inc. v. United States Gypsum Co.,* 315 Md. 741, 556 A.2d 1126 (1989). In *Cross Keys,* the Maryland Court of Appeals found that a company which had distributed information containing misrepresentations to architects and structural engineers might owe a duty of care to a developer whose architect used the information *so* distributed. *Id.,* 556 A.2d at 1134–35. The Maryland Court of Appeals, after finding that the information had been disseminated for a pecuniary purpose, stated that "[a]lthough the group of persons who may be expected to rely upon information of this kind may be large, they are identifiable .... That their names cannot be known in advance is of no consequence." *Id.* at 1134. Similarly, Superior may be able to establish that the universe of persons who could be expected to rely on the information provided by the Defendants in this action is not so large as to create the risk of imposing "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 1127.

**39.** JKV (joined by CHS and Terrapin) and CHS (joined by B & G) advance this argument.

**40.** JKV appears to assume (correctly) that Count VI does not state a claim against the Title Company Defendants. To the extent that CHS, an appraiser, has joined in JKV's motion, this discussion of Count VI does not apply to it.

**41.** Lorimar filed its motion to dismiss prior to Superior's filing of its Amended Complaint. Consumers' Motion was filed after, and is directed at, the Amended Complaint. Although Consumers claims that Count VI uses the term "Defendants," the first sentence of Paragraph 162 makes clear that Count VI is not stated against the Title Company Defendants. The Amended Complaint cures any ambiguity with respect to which Defendants are alleged to be liable under the negligent misrepresentation counts.

Organizations Act ("RICO") [42] was enacted in 1970 with the goal of eliminating the infiltration of organized crime into legitimate organizations. *See Benard v. Hoff,* 727 F.Supp. 211, 213 (D.Md.1989); *see also International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987) (stating that Congress intended "that RICO serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.").

Superior alleges that Defendants violated subsections (a), (c), and (d) of RICO. *See* Am. Compl. at ¶¶ 142–49. Several Defendants [43] allege that Superior has failed to allege the required elements of a claim under the aforementioned subsections.

### 1. *18 U.S.C. § 1962(c)*

■ Subsection (c) "is aimed at the use of an enterprise to carry out racketeering activities." *Benard,* 727 F.Supp. at 214. It provides in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c). In order to allege a violation of 18 U.S.C. § 1962(c), a Plaintiff must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted). Several Defendants argue that Superior has failed to allege sufficient facts to prove the following:

(1) a pattern of racketeering activity;

(2) the existence of a RICO enterprise;

(3) the existence of a RICO enterprise separate and apart from the Defendants;

(4) that the defendants conducted or participated in the operation or management of the enterprise.

In addition, several Defendants argue that Superior has failed to allege the required predicate acts with sufficient particularity.

### a. *Pattern of Racketeering Activity*

To state a claim for a violation of § 1962(c), a plaintiff must allege a "pattern of racketeering activity." The term "racketeering activity" includes mail fraud and wire fraud. *See* 18 U.S.C. § 1961(1)(B). The "pattern" element requires at least two acts of racketeering activity to be pleaded. *See* 18 U.S.C. § 1961(5). The Fourth Circuit has explained the purposes of this requirement as follows:

> [It] ensure[s] that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions ... are not eclipsed or preempted.

*Menasco, Inc. v. Wasserman,* 886 F.2d 681, 683 (4th Cir.1989).

The Supreme Court has developed a two-part test to define a "pattern of racketeering activity": (1) whether the predicate acts (for example, mail or wire fraud) are related, and (2) whether they pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492

---

**42.** 18 U.S.C. §§ 1961 *et seq.*

**43.** The following Defendants have challenged the sufficiency of Superior's RICO claims: Capital (joined by Accubanc, B & G and Cen-

tury); JKV (joined by CHS and Terrapin); CHS (joined by B & G); and Consumers (joined by Terrapin).

U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

### i. *Failure to Plead Commission of Predicate Acts by Each Defendant*

 Several Defendants [44] argue that Superior has failed to allege a "pattern of racketeering activity" against them because the Amended Complaint does not allege that each Defendant committed separate specific acts of mail or wire fraud. This argument is completely without merit, as section 1962(c) includes no requirement that mail or wire be used by each defendant. *Kerby v. Mortgage Funding Corp.*, 992 F.Supp. 787, 801 (D.Md.1998); *see Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954) (stating that "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, even though not actually intended, then he 'causes' the mails to be used.").

As discussed herein, Superior alleges specific instances of fraud which were committed by each Defendant. Initially, the Court notes that Superior alleges that "Defendants mailed and delivered the false and inflated appraisals, and false loan applications and settlement statements to Superior through the ... [mails] ... and/or by facsimile over the telephone wires." Am. Compl. at ¶ 144. Superior also alleges that Defendants caused "matters to be mailed" and caused "writings to be transmitted by means of wire communications in interstate commerce." *Id.* at ¶ 147.

Second, it is virtually certain that the Defendants, if they did any of the allegedly fraudulent acts alleged by Superior at all, would at some point have used the mails and wires themselves to transmit appraisals and loan documents, or at least would have foreseen that another person in the chain of communication would use the mails or wires. *Kerby*, 992 F.Supp. at 801. Accordingly, the fact that Superior does not allege specific use of mail or wire by each Defendant does not provide a basis for dismissal of the RICO claims.

### ii. *Relationship*

 In the Fourth Circuit, "[t]he relationship criterion may be satisfied by showing that the criminal acts 'have the same or similar purposes, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events.'" *Anderson v. Foundation for Advancement, Education and Employment of American Indians*, 155 F.3d 500, 505–06 (4th Cir.1998) (citation omitted).

Capital argues that Superior has failed to allege facts supporting the relationship criterion. Superior alleges that all of the Defendants actions had a single victim, all of the representations were made for the express purpose of inducing Superior, or another purchaser, to purchase loans from Tandem, and that the scheme involved several discrete types of actions which were repeated by individual Defendants. Furthermore, Superior alleges that Tandem used a group of several mortgage brokers, who in turn employed the same title companies and appraisers on multiple loan transactions which are involved in the alleged scheme.[45] In the dismissal context,

---

**44.** JKV (joined by CHS and Terrapin), Consumers (joined by Terrapin), Lorimar (joined by Terrapin) and CHS (joined by B & G) advance this argument.

**45.** *Davis v. Hudgins*, 896 F.Supp. 561 (E.D.Va.1995), upon which Capital relies, is factually distinguishable. There, the Plaintiff filed a RICO suit against eleven defendants. The allegations in plaintiff's complaint involved things as unrelated as lying in a deposition to threatening to sue the plaintiff for discrimination to filing a chapter 13 bank-

the Court finds these allegations sufficient to satisfy the relationship requirement.

### iii. *Continuity*

In order to plead a "pattern of racketeering activity," the Plaintiff must also allege that Defendants' acts pose a threat of continuing activity. There are two types of continuity: closed-ended and open-ended. *H.J., Inc.,* 492 U.S. at 241, 109 S.Ct. 2893. A "closed-ended" pattern of racketeering activity involves a course of related predicate acts during a substantial period of time which naturally comes to a close. *Id.* An "open-ended" pattern of racketeering activity, by contrast, is a course of conduct which lacks the duration and repetition which mark a closed-ended pattern. *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1022 (7th Cir.1992). The pattern alleged in this case appears to be open-ended. The continuity requirement in an open-ended case is met by showing conduct which by its nature projects into the future with a threat of repetition. *H.J., Inc.,* 492 U.S. at 242, 109 S.Ct. 2893.

Capital and CHS argue that Superior has failed to plead sufficient facts in support of the continuity element. Drawing all inferences in favor of Superior, as it must for purposes of the instant motion, the Court concludes that the Amended Complaint contains sufficient facts supporting the continuity element of a pattern of racketeering activity. The scheme to defraud Superior, and perhaps other purchasers of mortgage loans on the secondary market, has no limited goal. The acts alleged bear a sufficient relationship to the purpose of the alleged scheme to support the continuity element, and there is no

reason to believe that the Defendants would not have continued to engage in the same types of acts with respect to Superior or other purchasers. *See Thomas v. Ross & Hardies,* 9 F.Supp.2d 547, 554 (D.Md.1998). Furthermore, the mere fact that the alleged actions took place over a one year period is not conclusive. *See id.* at 555.

In sum, the Court concludes that Superior need not have alleged that each Defendant individually committed two predicate acts and that the relationship and continuity elements have been adequately pleaded. Accordingly, Superior's RICO claim does not fail for failure to allege a pattern of racketeering activity.

### b. *Enterprise*

Under Section 1962(c), the alleged "enterprise"[46] must be an entity whose members are "associated together for a common purpose of engaging in a course of conduct," and must be separate and distinct from the RICO defendants. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *see United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982). An enterprise may include an association of individuals and corporations. *Nunes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 609 F.Supp. 1055, 1064 (D.Md.1985).

In the RICO count, Superior alleges that "Defendants, individually and collectively, constitute an enterprise within the meaning of 18 U.S.C. § 1961(4)." Am.

---

ruptcy petition to defraud plaintiff. *Id.* at 565–66. The allegations involved in the case at Bar are not nearly as unrelated as those involved in *Davis.*

**46.** RICO defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Compl. at ¶ 149. Various Defendants [47] argue that Superior's allegation of an "enterprise" is insufficient to support its RICO claim.

Although Superior's allegation that the Defendants constitute an enterprise, standing on its own, might be insufficient to plead a RICO enterprise, the RICO count incorporates by reference all preceding paragraphs of the Amended Complaint. The Amended Complaint alleges that the Defendants associated with each other in an effort to induce Superior to purchase mortgage loans in amounts in excess of the fair market value of the mortgaged property. Am. Compl. at ¶¶ 45–60. The Amended Complaint further alleges, although in a somewhat disjointed fashion, each individual Defendant's participation in the scheme, and their relationship to each other. *Id.* at ¶¶ 61–133. Finally, the allegations in the Amended Complaint regarding the interrelationship between the Defendants and the use of the same Mortgage Brokers, Title Companies and Appraisers with respect to numerous loan transaction support a conclusion that the enterprise was an "ongoing organization," within which the members "function[ed] as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. Drawing all inferences in favor of Superior, the Court finds that Superior's allegations that the Defendants associated together sufficiently alleges the existence of an "enterprise" under RICO. *See Nunes,* 609 F.Supp. at 1064.

▆▆▆ Capital (joined by Accubanc, B & G, Baldeo, and Century) argues that Superior has failed to allege the existence of an "enterprise" distinct from the Defendants, because the Amended Complaint states that "Defendants, individually and collec-

tively, constitute an enterprise within the meaning of 18 U.S.C. § 1961(4)." Am. Compl. at ¶ 149. Obviously, if any of the individual Defendants were alleged themselves to constitute "the enterprise," they could not remain as a party to the RICO action. *See Nunes,* 609 F.Supp. at 1064 (stating that a defendant itself cannot be the "enterprise" in a RICO action under section 1962(c)). However, construing the Amended Complaint liberally in favor of Superior, the Court finds that the use of the word "individually" does not bar the RICO cause of action. Superior has adequately alleged an "association in fact" enterprise.

### c. *Participation in Operation or Management*

▆▆▆ Section 1962(c) only imposes liability on those who "conduct or participate, directly or indirectly in the conduct of an enterprise's affairs through a pattern of racketeering activity." *Thomas v. Ross & Hardies,* 9 F.Supp.2d 547, 554 (D.Md. 1998). The Supreme Court has authorized use of the "operation or management" test, which requires that a defendants must have some part in directing the affairs of the enterprise in order to be held liable under RICO. *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Although "[m]ere participation in the activities of the enterprise is insufficient," liability is not limited to upper management and those under their direction. *Thomas,* 9 F.Supp.2d at 554. Further, an individual may violate section 1962 through the provision of professional services, as long as he has some role in conducting the enterprise activities. *Id.* at 554–55.

---

**47.** At least Capital (joined by Accubanc, B & G and Century) and Lorimar (joined by Terra- pin) advance this argument.

■ Consumers (joined by Terrapin) argues that Superior's section 1962(c) claim should be dismissed because Superior fails to adequately allege participation in the operation or management of the enterprise. Consumers argues that because it was involved in closing only one of the twenty-three loans involved in the case, and because it merely relied upon information provided to it prior to settlement, it could not have participated in the "operation or management" of the enterprise. Superior alleges that Consumers knowingly made multiple misrepresentations related to the closing of the Ekanem loan. Am. Compl. at ¶¶ 123, 148(J). Furthermore, although Consumers states that it was merely relying upon information provided by others, Superior alleges knowledge on the part of Consumers, and Consumers' contrary allegations must be disregarded. Finally, that Consumers and the other Title Companies may have acted at the direction of Tandem and the Mortgage Brokers does not entitle them to dismissal of the section 1962(c) claim.[48] Although Consumers' role was apparently limited, drawing all inferences in favor of Superior, the Court cannot say that Superior can prove no set of facts which would entitle it to relief against Consumers under RICO.[49]

### d. *Adequacy of Fraud Allegations*

■ Various Defendants argue that Superior's RICO claim must be dismissed because Superior has failed to allege mail and wire fraud[50] with particularity as required by Rule 9(b). It is well established that Rule 9(b) applies to RICO claims where the alleged predicate acts involved fraud. *Kerby*, 992 F.Supp. at 799; *Windsor Assoc.*, 564 F.Supp. at 279–80. The Court has concluded herein that Superior has alleged fraud with sufficient particularity. *See infra*, section III.C.1. Furthermore, the Court concludes that Superior has sufficiently alleged the use of the mails and wires in connection with the allegedly fraudulent scheme. *See* Am. Compl. at ¶¶ 144, 147; *see also infra*, section III. F.1.a.i. As the Fourth Circuit has explained,

> a civil RICO suit may be maintained, not only in mail fraud cases where the deceitful mailing is the blade rushing down toward the guillotine victim, but also in cases involving more grandiose schemes to cheat, where the mailing is but part of the frame that holds the blade.

*Chisolm v. TranSouth Financial Corp.*, 95 F.3d 331, 336 (4th Cir.1996).

The Amended Complaint alleges a scheme to defraud Superior by use of the mails and wires in violation of civil RICO (as well as state common law) with sufficient particularity. *See Windsor Assocs.*, 564 F.Supp. at 280. Accordingly, Defendants are not entitled to dismissal of Superior's civil RICO claims due to a failure to meet the requirements of Rule 9(b).

**48.** *See Toucheque v. Price Brothers Co.*, 5 F.Supp.2d 341, 348 n. 3 (D.Md.1998) (stating that "[o]bviously, lower level operatives in the enterprise who act with tacit or explicit approval of the enterprise's upper management engage in sufficient conduct or participation to be liable under RICO.").

**49.** *See Clark v. Milam*, 847 F.Supp. 409, 416 (S.D.W.Va.1994) (defendants who knowingly concealed the activity of other defendants who exercised day-to-day control over the RICO enterprise not entitled to dismissal, although this conduct was certainly less active than the conduct they were concealing); *see also Thomas*, 9 F.Supp.2d at 555 (denying motion to dismiss although Plaintiff was "far from establishing" that the alleged acts were the "core activities" of the enterprise.).

**50.** No Defendant has challenged the sufficiency of Superior's bank fraud allegations.

### 3. *18 U.S.C. § 1962(a)*

 Section 1962(a) "is aimed at the use of racketeering proceeds to infiltrate an enterprise," *Benard,* 727 F.Supp. at 214, and provides in pertinent part:

> It shall be unlawful for any person who has received any income derived ... from a pattern of racketeering activity ... to use or invest ... any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise.

18 U.S.C. § 1962(a). To plead a violation of § 1962(a), a plaintiff must allege "(a) receipt of income from a pattern of racketeering activity, and (b) the use or investment of this income in an enterprise." *Busby v. Crown Supply, Inc.,* 896 F.2d 833, 836 (4th Cir.1990). Like section 1962(c), section 1962(a) requires a pattern of racketeering activity and an enterprise. Unlike section 1962(c), section 1962(a) does not require that the RICO Defendant be distinct from the "enterprise." *Id.* at 841. Section 1962(a) requires an additional element—that the income derived from the pattern of racketeering activity be used or invested in the enterprise.

 The Court has concluded herein that Superior has adequately pleaded a pattern of racketeering activity. *See infra,* section III.F.1.a. Superior alleges that "Defendants received income directly from the pattern of racketeering activity and used the income or its proceeds to operate themselves in violation of 18 U.S.C. § 1961(3)." Am. Compl. at ¶ 149. Drawing all inferences in favor of Superior, the Court concludes that Superior has pleaded

both elements of a cause of action under section 1962(a).[51]

### 4. *18 U.S.C. § 1962(d)*

 Several Defendants[52] argue that Superior has failed to sufficiently allege a conspiracy to violate RICO. Subsection (d) prohibits a conspiracy to violate any of the provisions of subsections (a), (b) or (c). 18 U.S.C. § 1962(d). Under *United States v. Pryba,* 900 F.2d 748 (4th Cir.1990), a RICO conspiracy may be proven by showing "that each defendant agreed that another coconspirator would commit two or more acts of racketeering ... RICO conspiracy does not require that each coconspirator personally agree to commit two or more acts of racketeering." *Id.* at 760. Superior's allegations must be held sufficient if they support the conclusion the Defendants "agreed that another coconspirator would commit two or more acts of racketeering." *Id.*

 JKV, CHS and Consumers argue that Superior has not alleged any explicit agreement on their part. However, "[t]he existence of a conspiracy need not be proved by direct evidence, but may be inferred from the facts and circumstances of the case." *United States v. Norris,* 749 F.2d 1116, 1121 (4th Cir.1984). Knowledge and participation may also be proved by circumstantial evidence. *Id.* Superior alleges that the Title Company Defendants participated in the scheme to defraud by including terms in settlement documents that they either knew were false, or should have known were false. Am. Compl. at ¶¶ 58–60. The Amended Complaint need not allege that Defendants knew that the

---

**51.** Capital argues that Superior's allegation that the Defendants used the income or proceeds "to operate themselves" rather than "to operate the enterprise" is fatal to the Amended Complaint. Reading the Amended Complaint liberally in favor of Superior, the Court

concludes that this choice of words does not bar Superior's RICO claim.

**52.** JKV (joined by CHS and Terrapin), CHS (joined by B & G) and Consumers (joined by Terrapin) advance this argument.

mails or wire would be used where, as here, the alleged acts were performed "with knowledge that the use of mails [or wires] will follow in the ordinary course of business." *Pereira,* 347 U.S. at 8–9, 74 S.Ct. 358. Finally, the fact that Consumers was involved in the closing of only one loan is not dispositive, as Superior alleges that several misrepresentations were made in connection with that loan, and the Amended Complaint supports an inference that Consumers agreed to participate in the scheme to defraud Superior.[53] Reading the Amended Complaint liberally and drawing all inferences in favor of Superior, one may reasonably infer that the Defendants participated in a conspiracy to violate RICO. *See Clark,* 847 F.Supp. at 418.

### G. *Pre–Judgment Interest and Attorney's Fees*

Lorimar and Consumers (both joined by Terrapin) argue that Superior has failed to adequately plead its claims for prejudgment interest and attorney's fees. Initially, the Court notes that neither Lorimar nor Consumers have cited any authority in support of their argument. Nor have they explained the standard that they believe supports dismissal of Superior's claims for these items, which are merely elements of damages.

■ As for Superior's claim for prejudgment interest, Maryland law allows an award of prejudgment interest on a liquidated sum, and in other circumstances. *Maryland State Hwy. Admin. v. Kim,* 353 Md. 313, 726 A.2d 238, 245 (1999). Superior has pled a liquidated sum, and any award of prejudgment interest will be left to the discretion of the Court or the jury to be determined at trial.

As for attorney's fees, Superior has agreed to voluntarily dismiss its claims for attorney's fees in Counts III through VII. Pl. Consol. Opp. at 43 n. 15. As for Superior's remaining claims for attorney's fees, only Count II (RICO) is stated against Lorimar and Consumers. Because RICO authorizes an award of attorney's fees, 18 U.S.C. § 1964(c), the Court will not dismiss Superior's claim under RICO for attorney's fees.

## IV. *CONCLUSION*

For the foregoing reasons:

1. Defendant Lorimar Title Corporation's Motion to Dismiss Counts II through VI [paper # 28] and Defendant Lorimar Title Corporation's Motion to Dismiss Counts II Through V of the First Amended Complaint [paper # 62] are GRANTED in part and DENIED in part;[54]

2. The Motion to Dismiss of Defendant George W. Johnson [paper # 32] is GRANTED in part and DENIED in part;[55]

3. The Motion to Dismiss of Defendant Capital Mortgage Finance Corp.

---

53. *See United States v. Tillett,* 763 F.2d 628, 632–33 (4th Cir.1985) (based on evidence that defendants agreed to captain their boats for the leader or a drug smuggling ring on two occasions, jury could reasonably have concluded that defendants understood that they were part of a RICO conspiracy, understood the scope of the conspiracy, and knowingly agreed to further the criminal objectives of the conspiracy).

54. Lorimar's Motions (which were joined by Terrapin and Pietropaoli) are GRANTED only as to Counts V and VI.

55. Johnson's Motion (which was joined by CHS and Silver) is GRANTED only as to Count IV.

[paper # 46] is GRANTED in part and DENIED in part;[56]

4. The Motion to Dismiss of Defendants JKV Real Estate Services and John K. Voyatzis [paper # 56] is GRANTED in part and DENIED in part;[57]

5. Defendant Tandem National Mortgage, Inc.'s Motion to Dismiss Counts III, IV, V, VI, and VII [paper # 59] is GRANTED in part and DENIED in part;[58]

6. The Motion to Dismiss of Defendant Golden Gate Appraisal Services, Inc. [paper # 73] is DENIED;

7. Defendant Consumers Title Company's Motion to Dismiss Counts II through VI of the First Amended Complaint [paper # 84] is GRANTED in part and DENIED in part;[59] and

8. The Motion for Judgment on the Pleadings of Defendants CHS Management, Inc. and Ross C. Silver [paper # 90] is GRANTED in part and DENIED in part.[60]

9. In sum, the following counts of the First Amended Complaint are dismissed:

 a. Count IV is DISMISSED against the Appraiser Defendants, comprising CHS Management, Inc., Ross C. Silver, Central Maryland Appraisers, Inc., JoAnn DiMartino, George W. Johnson, Erdolph Shiver, D.P. Appraisal, Inc., Narade Pramuan, Maureen O'Prey, Golden Gate Appraisal Services, Inc., Colonial Appraisers, Stuart Dickman & Associates, Inc., Stuart Harvey Dickman, Value Appraisals, and William Braunschweiger;

 b. Count V is DISMISSED against all Defendants;

 c. Count VI is DISMISSED against the Title Company Defendants, comprising JKV Real Estate Services, John K. Voyatzis, Terrapin Title LLC, Joseph Pietropaoli, Lorimar Title Corp., Century Title and Escrow Corp., and Consumers Title Company, Inc.; and

 d. Count VII is DISMISSED against the Appraiser Defendants, comprising CHS Management, Inc., Ross C. Silver, Central Maryland Appraisers, Inc., JoAnn DiMartino, George W. Johnson, Erdolph Shiver, D.P. Appraisal, Inc., Narade Pramuan, Maureen O'Prey, Golden Gate Appraisal Services, Inc., Colonial Appraisers, Stuart Dickman & Associates, Inc., Stuart Harvey Dickman, Value Appraisals, and William Braunschweiger;

10. With respect to Superior's remaining claims against Golden Gate Appraisal Services:

**56.** Capital's Motion (which was joined by Accubanc, B & G, Baldeo and Century) is GRANTED only as to Count V of the First Amended Complaint.

**57.** JKV's Motion (which was joined by CHS, Silver, Terrapin and Pietropaoli) is GRANTED only as to Count V of the First Amended Complaint.

**58.** Tandem's Motion is GRANTED only as to Count V of the First Amended Complaint.

**59.** Consumers' Motion (which was joined by Terrapin and Pietropaoli) is GRANTED only as to Counts V and VI of the First Amended Complaint.

**60.** CHS and Silver's Motion (which was joined by B & G and Baldeo) is GRANTED only as to Counts IV, V, and VII of the First Amended Complaint.

a. Superior shall have until June 9, 2000, to conducted expedited discovery on the issue of successor liability;

b. Golden Gate shall file any motion for summary judgment relating to the issue of successor liability by July 7, 2000.

11. With respect to all other remaining claims and Defendants, this case shall proceed pursuant to existing scheduling.

## MEMORANDUM AND ORDER RE MOTION FOR RE-CONSIDERATION

The Court has before it the Motion for Reconsideration or Summary Judgment filed by Defendants George W. Johnson and Golden Gate Appraisal Services, Inc. and the materials submitted by the parties relating thereto. The Court finds a hearing unnecessary to resolve the Motion.

## I. BACKGROUND

This case arises out of twenty-three mortgage loan transactions between Plaintiff Superior Bank FSB ("Superior") and Defendant Tandem National Mortgage, Inc. ("Tandem"). Superior has sued Tandem and various mortgage brokers, title companies and appraisers, including Defendants Golden Gate ("Golden Gate") and George W. Johnson ("Johnson"), asserting numerous common law and statutory claims. A number of parties filed motions to dismiss. On May 9, 2000, the Court issued a Memorandum and Order Re Motions to Dismiss Complaint and Amended Complaint ("the First M & O") which, *inter alia*, held that Count VI of Superior's Amended Complaint adequately pleaded a claim for negligent misrepresentation against the appraisers. Johnson and Golden Gate have now moved for reconsideration of the portion of the First M & O

which denied their motion to dismiss Superior's negligent misrepresentation claim. In the alternative, Johnson and Golden Gate are seeking summary judgment as to Count VI.

The factual background giving rise to this case was discussed in detail in the First M & O. In brief, Superior alleges that Tandem engaged in a scheme with various mortgage brokers, title companies and appraisers, including Johnson and Golden Gate, to induce Superior to purchase the twenty-three loans involved in this case at greatly inflated prices.

Superior alleges that the appraisers, who had been retained by various mortgage brokers, prepared appraisals which included false and inflated property values and, in some circumstances, failed to reflect that the property was the subject of a "flip" in that it had been bought and sold immediately prior to the appraisal. The appraisers submitted the appraisals to the mortgage brokers, who in turn provided the appraisals as part of the loan packages to Tandem, and ultimately Superior.

With respect to its negligent misrepresentation claim against Johnson and Golden Gate in particular, Superior alleges that Johnson prepared appraisals in connection with three of the loans at issue in the instant case. *See* Am. Compl. at ¶¶ 109–112 (appraisals for properties located at 1415 McCulloh Street and 1329 Mosher Street); 123–24 (appraisal for property located at 1415 Rutland Ave.). According to the Amended Complaint, Johnson appraised the properties at 1415 McCulloh Street and 1329 Mosher Street at $56,000 and $51,000 respectively, the same amounts as the contract prices on the properties. *Id.* at ¶¶ 109, 111. A second appraisal conducted by Superior appraised each of the properties at $20,000. *Id.* at ¶¶ 110, 112. The initial appraisals conducted by Johnson failed to reflect that

both of these properties were "flips". *Id.* Johnson appraised the property at 1415 Rutland Ave. for $43,000, the same amount as the contract price. *Id.* at ¶ 123. Johnson's appraisal failed to reveal that the property was a "flip", and a second appraisal conducted by Superior appraised the property at $39,000. *Id.* at ¶ 124. Superior alleges that Johnson and Golden Gate knew or should have known that each of these appraisals would be relied upon by an entity such as Superior who might purchase the loans at issue on the secondary loan market. *Id.* at ¶¶ 19, 45–60, 101.

The parties have presented additional evidence obtained through discovery which has taken place to date. Johnson and Golden Gate attach particular significance to the fact that they were retained by the mortgage brokers to perform the appraisals on each of the properties, and appear to argue that this fact alone warrants summary judgment in their favor. *See* Johnson Dep. at 31, 73. Johnson and Golden Gate also contend that the borrowers paid for the appraisals; however the record is not conclusive on this point. *Compare* HUD–1 Settlement Statements (indicating that borrowers paid for appraisals) *with* King Dep. at 78–79, 81, 136–141, Ekanem Dep. (Vol.I) at 91–93 *and* Ekanem Dep. (Vol.II) at 134–36, 143–44 (indicating that borrowers did not pay any cash at settlement).

Superior has provided the Court with copies of the appraisals prepared by Johnson and Golden Gate, and points to a provision which states that:

> The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report ... to anyone *other than* the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia.

Superior Exs. 2, 3, 4 (emphasis added). Superior contends that this provision supports its contention that Johnson and Golden Gate knew that the appraisals would be provided to the mortgagee (here, Tandem), and its successors or assigns (here, Superior).

## II. *LEGAL STANDARDS*

### A. *Reconsideration*

Johnson and Golden Gate state that their Motion for Reconsideration is brought pursuant to Rule 54(b), 59(e) and 60(b). Rules 59(e) and 60(b) are not, however, proper vehicles for seeking reconsideration of an interlocutory order.[1] Both Rule 59(e) and Rule 60(b) are applicable only to final judgments. In *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462 (4th Cir.1991), the Fourth Circuit held that such a motion may properly be brought under Rule 54(b), which states that an interlocutory order "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." *Id.* at 1470 (*quoting* Fed. R.Civ.P. 54(b)).

The precise standard which should govern a motion for reconsideration of an interlocutory order is far less clear. In *Fayetteville*, the Fourth Circuit declined to "thoroughly express [its] views on the interplay of Rules 60, 59 and 54." *Id.* at 1472. It is clear that a motion for

---

1. The First M & O is an interlocutory order because less than all claims as to all parties were adjudicated.

reconsideration of a interlocutory order is not governed by the precise standard which applies to Rule 60(b) motions. *Id.* at 1470 (expressing vigorous disagreement "with the district court's adoption of a Rule 60(b) standard."). The Fourth Circuit has, however, suggested that at least parts of the Rule 60(b) standard may be referenced by a district court in determining whether it should reconsider an interlocutory order. *Id.* (citing with approval *Gridley v. Cleveland Pneumatic Co.,* 127 F.R.D. 102 (M.D.Pa.1989)). Consistent with this statement, the Court will be guided by the general principles of Rules 59(e) and 60(b), but does not consider itself bound by those Rules' strictures.[2] *See Shrewsbury v. Cyprus Kanawha Corp.,* 183 F.R.D. 492, 493 (S.D.W.Va.1998).

### B. *Summary Judgment*

A motion for summary judgment shall be granted if the pleadings and supporting documents "show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The well established principles pertinent to such motions can be distilled to a simple statement.

The Court must look at the evidence presented in regard to the motion for summary judgment through the non-movant's rose colored glasses, but must view it realistically. After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law. *E.g. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

### III. *DISCUSSION*

Under Maryland law, a negligent misrepresentation claim requires proof that:

(1) The defendant, owing a duty of care to the plaintiff, negligently asserted a false statement;

(2) The defendant intended that his statement will be acted upon by the plaintiff;

(3) The defendant had knowledge that the plaintiff would probably rely on the statement, which, if erroneous, would cause loss or injury;

(4) The plaintiff, justifiably, took action in reliance on the statement; and

(5) The plaintiff suffered damage proximately caused by the defendant's negligence.

*Gross v. Sussex,* 332 Md. 247, 630 A.2d 1156, 1162 (1993).

---

**2.** "A motion for reconsideration (or, to alter or amend judgment) made pursuant to Fed. R.Civ.P. 59(e) may be made for one of three reasons: (1) an intervening change in the controlling law has occurred, (2) evidence not previously available has become available, or (3) it is necessary to correct a clear error of law or prevent manifest injustice." *Weyerhaeuser Corp. v. Koppers Co., Inc.,* 771 F.Supp. 1406, 1419 (D.Md.1991).

A party may obtain relief from a judgment or final order pursuant to Rule 60(b) based upon "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud ... misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b).

Where alleged negligence creates a risk of economic loss only, "an intimate nexus between the parties [i]s a condition to the imposition of tort liability." *Weisman v. Connors*, 312 Md. 428, 540 A.2d 783, 791 (1988) (quoting *Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986)). Under Maryland law, such an intimate nexus requires "contractual privity or its equivalent." *Id.* As noted in the First M & O, Superior does not allege that a contractual relationship existed between itself and Johnson and/or Golden Gate. *See* First M & O at 40. The question, therefore, is whether Superior can prove the legal equivalent of contractual privity.

In the First M & O, the Court determined that Superior had adequately alleged the presence of an intimate nexus between itself and Johnson and/or Golden Gate. *Id.* at 39–41. The Court recognized that "an 'intimate nexus' cannot exist unless a defendant is aware of a specific party or class of parties which intend to rely upon the statement." *Id.* at 40 (*citing Tischler v. Baltimore Bancorp.,* 801 F.Supp. 1493 (D.Md.1992)). The Court relied upon the Maryland Court of Appeals' decision in *Village of Cross Keys, Inc. v. United States Gypsum Co.*, 315 Md. 741, 556 A.2d 1126 (1989), in which Maryland's highest court stated[3] that a company which had distributed information containing misrepresentations to architects and engineers might owe a duty of care to a developer whose architect used the information. First M & O at 41 n. 38 (citing *Cross Keys*, 556 A.2d at 1127, 1134–35). The Court found that, in the dismissal context, Superior had alleged the requisite knowledge on the part of Johnson, Golden Gate, and all of the appraisers, and that the universe of persons who could be expected to rely upon the information might not be so large as to raise the concern that

liability would be imposed on an indeterminate class of persons. *Id.*

Johnson and Golden Gate allege that the Court erred in allowing Superior's negligent misrepresentation claim against them to survive dismissal, or in the alternative, that Johnson and Golden Gate are entitled to summary judgment as to Count VI. Johnson and Golden Gate advance three principal arguments in support of their position:

(1) That three other judges of this District have held that appraisers do not owe a duty of care to a lender under Maryland law in factual scenarios assertedly indistinguishable from that of the case at Bar;

(2) That the undersigned Judge's own decision in *Tischler v. Baltimore Bancorp*, 801 F.Supp. 1493 (D.Md. 1992) establishes that one of the cases relied upon by the Court in the First M & O is factually distinguishable from the case at Bar; and

(3) That no Maryland case has found the existence of a tort duty of care under facts similar to those presented in the case at Bar.

The Court will address each of these arguments in turn.

Johnson and Golden Gate base their first argument upon *Huntington Mortgage Co. v. Mortgage Power Financial Svcs., Inc.*, 90 F.Supp.2d 670 (D.Md.2000), and two unpublished decisions from this District, *Pan American Bank, FSB v. AAA Mortgage Group, Inc.*, Civil Action No. JFM 98–3181 (D.Md. May 25, 1999), and *Union Federal Savings Bank of Indianapolis v. Allstate Funding Corp.*, Civil Action Nos. WMN 99–2021, WMN 99–2028, WMN 99–2029 (D.Md. March 13, 2000). Johnson and Golden Gate correctly state

---

**3.** Albeit in dicta.

that three judges within this District have dismissed negligent misrepresentation claims brought by lenders against appraisers. After careful examination, the Court concludes that none of these decisions warrant revision of the First M & O.

In *Huntington*, Judge Williams held that an appraiser could not be held liable to a lender under a negligent misrepresentation theory. 90 F.Supp.2d at 672–73. Judge Williams appears to have viewed the presence of contractual privity as an absolute requirement of the tort of negligent misrepresentation. *Id.* at 672 (stating that "under well-settled precedent, Maryland law requires that contractual privity exist between parties for a claim of negligent misrepresentation to lie."). Judge Williams also found no indication that the Maryland Court of Appeals would recognize a negligent misrepresentation claim absent contractual privity where only economic loss was alleged. *Id.* at 673. Finding no contractual relationship, Judge Williams determined that no negligent misrepresentation claim could lie. *Id.*

The parties in *Huntington* do not appear to have argued that the "equivalent" of a contractual relationship was present in that case, which is the precise issue presented in the case at Bar. Accordingly, Judge Williams did not address any such possibility. In any event, the undersigned Judge is of the view that the Maryland Court of Appeals would allow a negligent misrepresentation claim to lie absent an explicit contractual relationship, provided that the legal equivalent of contractual privity is established. *See Cross Keys,* 556 A.2d at 1127, 1134–35.[4]

As unpublished decisions from other Judges of this District, *Pan American Bank* and *Union Federal Savings Bank*

have no precedential effect. Moreover, it is not entirely clear from these decisions whether the Judges were presented with an equivalent contention or, if so, what evidence was relied upon.

In *Pan American Bank*, Judge Motz dismissed a lender's claim for negligent misrepresentation against an appraiser. Judge Motz relied on the New York Court of Appeals' decision in *Ultramares v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), which was discussed by the Maryland Court of Appeals in *Jacques v. First Nat'l Bank,* 307 Md. 527, 515 A.2d 756 (1986). In *Ultramares*, the New York Court of Appeals held that an accountant who negligently prepared a corporation's balance sheet could not be held liable to an individual who loaned the corporation money after reviewing the balance sheet. 174 N.E. at 446. The *Ultramares* court concluded that the accountant owed no duty "to the indeterminate class of persons who ... might deal with the [corporation] in reliance on the audit." *Id.* Without elaboration, Judge Motz in *Pan American Bank* reasoned that it would be equally improper to find that a duty ran from an appraiser to a lender.

It is impossible to determine whether the parties in *Pan American Bank* argued, as Superior does here, that the class of persons who might have relied on the appraisals performed by Johnson was not "indeterminate." In the First M & O, the undersigned Judge determined that Superior might be able to prove that the universe of persons who could be expected to rely on the information provided by Johnson and Golden Gate is not so large as to create the risk of imposing "liability in an indeterminate amount for an indetermi-

---

4. The Court will discuss below Johnson's argument that *Cross Keys* is distinguishable

from the case at Bar.

nate time to an indeterminate class." First M & O at 41 n. 38. Although possibly not dispositive, this matter appears to have a degree of importance under Maryland law. *See, e.g., Cross Keys,* 556 A.2d at 1134; *Weisman,* 540 A.2d at 792 (*quoting Ultramares,* 174 N.E. at 446); *Jacques,* 515 A.2d at 760 (same); *see also Tischler,* 801 F.Supp. at 1505–06. Because Judge Motz's decision does not discuss this issue, the reasoning of *Pan American Bank* does not compel reconsideration of the First M & O.

In *Union Federal Savings Bank,* Judge Nickerson relied upon *Pan American Bank* in concluding that no duty existed between an appraiser and a lender. Judge Nickerson also rejected the plaintiff's argument, also advanced by Superior herein, that a term in the appraisals which placed the appraiser on notice that the appraisal could be transmitted to a third party created a duty of care. Judge Nickerson stated that "[t]he acknowledgment or awareness that some third party could or would see the work product done for another, however, does not create contractual privity with that third party." [5]

Here too, it is not clear whether the parties argued, or whether Judge Nickerson considered, whether the class of persons involved in *Union Federal Savings Bank* was sufficiently determinate to support a finding that an intimate nexus exists for purposes of a negligent misrepresentation claim. For the same reasons discussed above, the undersigned Judge does not believe that the *Union Federal Savings Bank* decision requires reconsideration of the First M & O.

Johnson and Golden Gate's argument that the undersigned Judge's decision in *Tischler,* 801 F.Supp. 1493, requires reconsideration of the First M & O is misplaced. In *Tischler,* the undersigned Judge concluded that a corporate shareholder could not bring a negligent misrepresentation claim against the corporation's directors based upon allegedly fraudulent statements concerning the corporation's financial affairs which were communicated via a press release to the general public. *Tischler,* 801 F.Supp. at 1503–06. The undersigned Judge noted that, in *Jacques,* the Maryland Court of Appeals distinguished economic versus personal injuries, requiring a showing of a direct relationship, or "intimate nexus," when, as here, only economic injury is alleged. *Id.* at 1504 (citing *Jacques,* 515 A.2d at 759–60). In reaching this conclusion, the Maryland Court of Appeals had relied upon two decisions from the New York Court of Appeals which considered the issue. As stated in *Tischler:*

> In *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 277 (1922), Judge Cardozo held that a public weigher of beans was liable to the buyer of beans for negligence in the weighing, regardless of the fact that the weigher was hired and paid by the seller. Because the buyer was the known and intended beneficiary of the contract between the seller and the weigher, the Court found that a duty existed.
>
> In contrast, in *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931), the [New York] Court of Appeals

---

**5.** Judge Nickerson also distinguished the Fourth Circuit's decision in *Banca Del Sempione v. Provident Bank of Maryland,* in which a Swiss bank to which rights under a letter of credit ("LOC") had been transferred sued the issuer of the LOC for negligent misrepresentation. The Fourth Circuit, relying on a con-

tractual provision which explicitly made the LOC transferable, concluded that the plaintiff had adequately alleged "contractual privity or its equivalent" as required by Maryland law. *Id.* at 963–64. Because no party relies on *Sempione* in the case at Bar, this Court sees no need to discuss it.

found that public accountants who carelessly prepared and certified a balance sheet for a corporation was not liable to a[n individual] who made loans to the corporation in reliance upon the balance sheet. This was so even though the accountants were on notice that the balance sheet would be relied upon by others. The Court held that "there was [no] contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants ... to the indeterminate class of persons who ... might deal with the [corporation] in reliance on the audit." *Id.* 174 N.E. at 446.

*Tischler*, 801 F.Supp. at 1504 (parallel citations omitted).

The undersigned Judge also recognized that the Maryland Court of Appeals has continued to require contractual privity *or its equivalent* before imposing a tort duty when only economic loss is alleged. *Tischler*, 801 F.Supp. at 1504. The *Tischler* decision reviewed several more recent cases in which the Maryland Court of Appeals had addressed the issue of duty in cases involving only economic loss. In *Weisman*, 540 A.2d at 793, the Maryland Court of Appeals held that face to face interaction created the equivalent of contractual privity. In *Giant Food v. Ice King, Inc.*, 74 Md.App. 183, 536 A.2d 1182, 1185 (Spec.App.1988), the Maryland Court of Special Appeals held that a business relationship that extended over seven months created an intimate nexus.

The undersigned Judge further noted a New York decision which had applied the "intimate nexus" requirement to facts analogous to those presented in *Tischler*. In *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054 (S.D.N.Y.1989), the United States District Court for the Southern District of New York determined that a shareholder plaintiff could not sue the directors

of a corporation for allegedly fraudulent statements that were made in a press release which was disseminated to the general public. *Id.* at 1062. As Johnson and Golden Gate point out, the *Brickman* court stated that duty will be found under New York law where the "plaintiff's intended reliance, on the information directly transmitted by the [defendant,] create[s] a bond so closely approaching privity that it [is], in practical effect, virtually indistinguishable therefrom." *Tischler*, 801 F.Supp. at 1505 (*quoting Brickman*, 722 F.Supp. at 1062) (alterations in original). The undersigned Judge found the reasoning of *Brickman* particularly persuasive because of the closely analogous facts involved in that case and *Tischler*. *Tischler*, 801 F.Supp. at 1505.

Johnson and Golden Gate argue that this Court should have reached the same result as in *Tischler* with respect to the relationship between themselves and Superior. Furthermore, Johnson and Golden Gate contend that the First M & O overlooked "the first requirement in Brickman," that there be direct transmission of information by the defendant to the plaintiff. Johnson and Golden Gate also read the decision in *Tischler* as containing an absolute requirement that the plaintiff be the "known and intended beneficiary" of a contract in order to impose a duty. The undersigned Judge is not all convinced that the Maryland courts would require face-to-face interaction, or a third party beneficiary relationship, and finds the situation involved in Brickman and Tischler to be distinguishable from the facts alleged by Superior. As noted in the First M & O, Superior may succeed in establishing that the universe of persons who could be expected to rely on the appraisals provided by Johnson and Golden Gate allows for the imposition of a tort duty under Maryland law. First M & O at 41.

Finally, in *Tischler*, the undersigned Judge discussed the Maryland Court of Appeals' decision in *Cross Keys*, 556 A.2d 1126, and, on the facts involved in *Tischler*, found it distinguishable. *Tischler*, 801 F.Supp. at 1505–06. In *Tischler*, the press release was directed to the "general universe of the public at large," while in *Cross Keys* the statement was "targeted to a specific group of persons." *Tischler*, 801 F.Supp. at 1506.

Again, Johnson and Golden Gate contend that the Court should have reached the same conclusion with respect to the facts involved in the case at Bar. After carefully considering the issue once more, the undersigned Judge remains convinced that the facts alleged by Superior are distinguishable from those involved in *Tischler*, and more closely analogous to those presented in *Cross Keys*.

Johnson and Golden Gate argue that *Cross Keys* incorporates an absolute requirement that the allegedly negligent misrepresentation be made for a pecuniary purpose. It is true that the Maryland Court of Appeals found that the defendants in *Cross Keys* disseminated the allegedly false statements for the purpose, albeit indirectly, of earning a profit. *Cross Keys*, 556 A.2d at 1134. However, it is hardly unreasonable to conclude on the present record that Johnson and Golden Gate provided inflated appraisals for a pecuniary purpose. Certainly, as in *Cross Keys*, their motive was not purely altruistic. *See Cross Keys* at 1134.

Finally, Johnson and Golden Gate distinguish the case at Bar from four decisions in which the Maryland Court of Appeals found a tort duty to exist, and argue that these distinctions somehow justify a ruling in their favor. *See L & P Converters v.*

*Alling & Cory*, 100 Md.App. 563, 642 A.2d 264 (1994) (finding duty were misrepresentations occurred during pre-contractual discussions); *Weisman*, 540 A.2d at 793 (finding duty where face-to-face interaction occurred); *Ice King*, 536 A.2d at 1185 (finding duty where business relationship extended over seven months); *Martens Chevrolet v. Seney*, 292 Md. 328, 439 A.2d 534 (1982) (finding duty where misrepresentations were made during contract negotiations). These decisions do not warrant a holding for Johnson and Golden Gate. It appears that no Maryland court has ever decided a case involving facts which are analogous to those alleged by Superior in the case at Bar; however, this happenstance does not mean that the Maryland Court of Appeals necessarily would hold for the defense on the record of the instant case.

At least two decisions applying New York law, upon which the Maryland courts have long relied in the area of tort duties, have held that appraisers owe a duty of care to third parties. In *Chemical Bank v. National Union Fire Insurance Co.*, 74 A.D.2d 786, 425 N.Y.S.2d 818 (1980), the owner of a tract of land hired an appraiser, who appraised the property at $2,455,000. *Id.*, 425 N.Y.S.2d at 820 (Murphy, P.J., dissenting).[6] An updated appraisal, also prepared at the owner's request, appraised the property at $3,069,000. *Id.* The owner sought refinancing of the property, and obtained a loan. *Id.* The owner provided the updated appraisal to an insurance company, who relied upon it in connection with the issuance of a surety bond guaranteeing the payment of the loan. *Id.* The owner later defaulted on the loan, and the bank attempted to collect upon the surety bond.

**6.** The facts of the case were not discussed in detail in the majority opinion. Only one judge dissented from the majority opinion.

*Id.* The insurer obtained two appraisals, one of which indicated that the property was worth $300,000, and the other of which stated a fair market value of $638,000.[7] *Id.* The insurance company sued the appraiser for gross and reckless negligence, and argued that the appraiser owed the insurance company a duty of care because it was foreseeable that an insurer might rely upon the updated appraisal report. *Id.* A New York trial court, applying the doctrine of *Ultramares,* denied the appraiser's motion for summary judgment. An intermediate New York appellate court affirmed, refusing to hold the appraiser exempt from liability to the insurance company. *Id.* at 819 (majority opinion).

In *Chemical Bank,* the court relied upon *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977), in which the New York Court of Appeals found that an accounting firm owed a duty to plaintiffs who, although not specifically foreseen, were members of a "limited class whose reliance on the [financial statements] was, or at least should have been, specifically foreseen." *White,* 401 N.Y.S.2d 474, 372 N.E.2d at 319. The *Chemical Bank* court, applying *White,* stated that:

> if it were known that it was within the contemplation of the appraiser and the owner when they contracted for the appraisal that a financing party would rely upon it and be persuaded by it, then, since those whose conduct would be governed would be a 'fixed, definable and contemplated group' the appraiser would

have assumed a duty of care for the benefit of those in the group.

*Chemical Bank,* 425 N.Y.S.2d at 819 (majority opinion). The Court finds this reasoning to be applicable to the case at Bar, in which Johnson and Golden Gate contracted to provide appraisals with the knowledge that those appraisals would be relied upon by purchasers of mortgage loans on the secondary market.

In *Guildhall Insurance Co., Ltd. v. Silberman,* 688 F.Supp. 910 (S.D.N.Y.1988), an owner hired an appraiser to value certain artifacts he had collected. *Id.* at 912. An insurance company, which had originally issued an insurance policy at the purchase price, increased the value of the policy in reliance on the appraisal. *Id.* A portion of the insured property was stolen, and the owner collected $1,811,000 on the policy. *Id.* Later, the stolen property was recovered, and the insurance company offered to exchange the property for the amount that had been paid on the policy. *Id.* After the owner refused, the insurance company retained an independent appraiser, who valued the stolen artifacts at $200,000. *Id.* The insurance company filed suit against the appraiser, asserting claims for fraudulent and negligent misrepresentation. *Id.*

The United States District Court for the Southern District of New York, relying on New York decisions interpreting *Ultramares, Glanzer* and *White,* rejected the appraiser's argument that he owed no duty to the insurance company, and denied the appraiser's motion for summary judgment on the negligent misrepresentation claim.[8]

---

7. These appraisals had, for some reason, been commissioned by the owner after the issuance of the surety bond.

8. In support of its conclusion, the *Guildhall* court noted that Plaintiff had submitted evidence that:

(1) the appraiser was aware of the 'particular purpose' for which he was retained (to obtain insurance);

(2) the appraiser was aware of a particular class of parties (insurance companies) who would rely upon the appraisal; and

*Guildhall,* 688 F.Supp. at 914–15. The Court finds that the *Guildhall* decision provides additional persuasive authority in support of its earlier conclusion that dismissal of Superior's negligent misrepresentation claim against Johnson is not warranted.

In sum, the Court finds, consistent with its earlier decision, that Superior has alleged sufficient facts to withstand dismissal of its negligent misrepresentation claim. Johnson and Golden Gate have not provided the Court with a valid reason to reconsider its earlier determination. In addition, the Court finds that Johnson and Golden Gate have failed to establish that they are entitled to summary judgment with respect to Superior's negligent misrepresentation claim. Accordingly, Johnson and Golden Gate's Motion will be denied in its entirety.

## IV. CONCLUSION

For the foregoing reasons:

1. The Motion for Reconsideration filed by Defendants George W. Johnson and Golden Gate Appraisal Services, Inc. is DENIED.

2. The Motion for Summary Judgment filed by Defendants George W. Johnson and Golden Gate Appraisal Services, Inc. is DENIED.

3. The Court's May 9, 2000 Memorandum and Order re Motions to Dismiss Complaint and Amended Complaint remains in full force and effect.

4. The case shall continue pursuant to existing scheduling.

(3) professional guidelines imposed a duty upon appraisers to act for the benefit of third parties.

*Id.* at 914–15. In the case at Bar, Superior has similarly presented evidence that Johnson and Golden Gate were aware that a lender would rely on the appraisals for the purpose of extending mortgages. Johnson Dep. at 61–62, 64–65, 128–29. Superior also argues that the codification of the Uniform Standards of Professional Appraisal Practice guidelines ("USPAP"), 12 C.F.R. § 323.4; COMAR §§ 09.19.05.01, 09.19.10.02, supports a finding that appraisers owe a duty of care to third parties. Because the extent to which the US-PAP guidelines impose a duty of care cannot be determined on the current record, the Court expresses no opinion as to the merit of Superior's final argument. At this stage in the litigation, it suffices to say that Superior has adequately pleaded a cause of action for negligent misrepresentation.